STAPLES, J.
This is a controversy concerning the probate of a paper purporting to be the last will of Mrs. Ann P. Hatcher. The parties in the court below waived a trial by jury and submitted the whole matter to the ^determination of the judge, who. after hearing all the evidence, was of opinion that “the paper writing in question is not the last will of Ann P. Hatcher,” and refused to admit the same to probate. From that order an appeal was taken to this court. The only question in the case we have to determine is, whether the will was subscribed by the witnesses in the presence of the testatrix, in the manner required by the statute. Upon this question there is some conflict in the testimony, and if the learned judge of the circuit court had based his decision upon the credit given by him to the witness against the will rather than to those in its favor, this court, upon familiar principles, would not undertake to reverse that decision, unless, indeed, in case of a plain and palpable mistake or error. It, is obvious, however, that the learned judge proceeded upon no such grounds. His written opinion, which is part of the record, shows that, according to his viéw, it is necessary to a valid will that every fact relating to the execution of the instrument and the sanity of the testatrix, shall be proved by the two subscribing witnesses.
After citing the statute and a decision of Chancellor Walworth, in Scribner v. Crane, 2 Paige R. 147, he proceeds as follows: “Judge Brooke, in the case of Dudleys v. Dudleys, 3 Leigh 436, reiterated_ in Clarke and others v. Dunnavant. 10 Leigh 13, 29, savs: ‘that however full the testimony of one witness may be to prove a will, our statute requires two witnesses to the facts which are necessary to be proved.’ Let us, then, apply these principles to the case before us.” The learned judge then comments upon the evidence of the two subscribing witnesses— first of Dr. Grymes, and then of Clarke. He declares that they are at points; that Clarke says that he never at any time heard Mrs. Hatcher acknowledge the will; that he did not see her sign or make her mark as a signature; she did not speak while he (Clarke) was *in the room, nor is it pretended that she ever spoke after-wards; and, to use his own language, she was in a “dying condition,” and her eyes set in death. The learned judge then asks: “Is it necessary, then, that two witnesses should certify to their knowledge of the mental capacity of the testatrix at the time the paper is completed; that it was executed by her freely and understandingly, with a full knowledge of its contents? Surely Clarke could not so testify.”
After these explicit avowals, I cannot see how it is possible to avoid the conclusion that the learned judge was of opinion that the two subscribing witnesses must prove the proper execution of the will and the capacity of the testatrix; and his rejection of the will was based upon the absence of such *34 proof in this case. This view is strongly confirmed by the fact that, although there is other testimony in the record besides that of the two subscribing witnesses, bearing directly upon the question of the due execution of the will and the capacity of the testatrix. no allusion is made .to that testimony. It is impossible for this court to say what would have been the decision of the circuit judge had he felt himself at liberty to consider the evidence of the other witnesses, or had he been of opinion that a will may be proved by one of the subscribing witnesses only. It is fair to presume that he had believed that Mrs. Hatcher was unconscious at the time of Clark’s attestation, or had he believed upon the whole evidence that the will was not duly executed, that he would have so declared, instead of confining his view to the testimony of the two subscribing witnesses as affected by the particular rule of law announced by him. At all events, a careful reading of the opinion would satisfy every one that the judge of the circuit court refused the probate, not because he believed the statement of Clarke inpreference to the other evidence, *but because he held to the idea that the will must be proved, as also the capacity of the testatrix, by the two subscribing witnesses.
I have thus dwelt upon this point because it is necessary to understand precisely the ground upon which the will was rejected in the court below. For all will agree that if that decision was based, not upon the weight and credibility of all the evidence, but upon an erroneous principle announced, with respect to the number of witnesses required to establish a particular fact, the parties have a right to insist that the case shall be reviewed in this court: The farthest this court has gone is to declare that the decision of the trying court for or against the will, is to conclude all mere questions of fact depending upon the credit to be given to the witnesses. Jesse et als. v. Parker’s adm’rs, 6 Gratt. 57. The question then arises, Is the construction of the statute correctly given by the learned judge of the circuit court? The opinion of Judge Brooke, in Clarke et als. v. Dunnavant. from which the extract is given, was not concurred in by the two other judges who sat in that case. Judge Parker said: “The law regulating devises requires reasonable proof that every statutory provision has been complied with, but it does not prescribe the mode of proof, nor that the will shall be proved, as well as attested, by two or more credible witnesses, nor that(frail memory shall change its nature and*perform impossibilities.” And this was the view taken by Judge Tucker.
In Pollock and wife v. Glassell, 2 Gratt. 439. 462. Judge Baldwin said: “The statute does not prescribe the number of witnesses by whom a will shall be proved, but the number only by whom it shall be attested. Any one of the subscribing witnesses may prove the execution of the will and its due attestation by himself and the others, and if his testimony be satisfactory, it is sufficient. If this were otherwise, then the proof of a duly attested *will might be defeated by the death or forgetfulness of some of the other witnesses.” In this part of the opinion I understand all the judges as concurring, including Judge Brooke.
In Jesse v. Parker’s adm’rs et als., 6 Gratt, 57-64, Judge Allen, delivering the opinion of the whole court, said that, “Although there must be satisfactory proof that every statutory provision has been complied with, in order to establish a will, the law does not prescribe the mode of proof, nor that the will shall be proved, as well as attested, by a specific number of witnesses. If such proof were to be required from each subscribing witness, validity of wills would be made to depend upon the memory and good faith of a witness, and not upon reasonable proof that all the requirements of the statute had, in fact, been complied with.”
The authorities elsewhere are equally explicit in support of the same doctrine, as may be seen by reference to the cases cited in Judge Baldwin’s opinion, and in Tarrant v. Ware, 25 New York 425; Nelson v. McGiffert, 3 Barb. Ch. R. 158; Jauncey v. Thorne, 2 Barb. Ch. R. 40.
The law would seem, therefore, to be too well settled to be called in question.
It is now to be considered whether the will in this case was properly executed. I think it may be regarded as proved beyond controversy that the will was written at Mrs. Hatcher’s request; that every word of it wasodictated by her; that it is in conformity with her wishes; that it was subscribed by Dr. Grymes in her presence and at her request, and that she was at that time possessed of sound and disposing mind and memory.
It may be assumed also, as fully established by the evidence, that Clarke, the other attesting witness, was present in the room when the will was written, when' it was signed by the testatrix, acknowledged by her and attested *by Dr. Grymes; and was a witness to these acts as they were successively performed. In regard to these matters there can be no solid ground for dispute. The real difficulty in the case is in ascertaining whether Clarke subscribed the will “in the presence of Mrs. Hateher.” Was she at that time in a condition to know and understand that the paper he was attesting was the same she had caused to be written and had signed and acknowledged as her will? When she was told by her physician that she must die very soon, she said she wished Mr. Brooks, an attorney, sent for. She was told he could not get there. She again peremptorily said. I want Mr. Brooks sent for. Being told it was useless, he could not reach there in time, she called Mr. Cheatham and asked him to bring pen, ink and paper, which he did, and the will was written as she dictated. She was asked if that was the disposition she desired of her property? She said yes; except she wished to leave Bettie Ferguson $1,500, and to Desdie Lester her gold watch. This clause *35 being added, the will was read over to her a second time. She said it was as she wished it. She was asked if she was ready to sign. She said no; she wanted to read it —called for her glasses and seemed to be reading it — then called for a pen. It was suggested that Mr. Cheatham would sign for her. She said no; she generally did that sort of business herself. She took the pen and her hand trembled; she then handed it to Cheatham, saying, you sign my name and I will make my mark; which was done. Dr. Grymes then said, do you wish me to sign it as a witness? She said she did. And he then subscribed his name in her presence.
All will agree that up to this period Mrs. Hatcher displayed good sense, clearness of mind, and a resolute purpose, with regard to the disposition of her property. After Dr. Grymes had signed the will, Mr. Cheatham said to Clarke, who was in the room. you can also act as a ''witness. And there is no doubt that Clarke then expected to become a subscribing witness. He was, however, not then further called on. The reason was that none of those present supposed it to be necessary for two witnesses actually to subscribe the will.
Immediately after these occurrences, Clarke was sent for a Mrs. Morris, a lady living a mile and a half distant, to assist in attending to Mrs. Hatcher. During his absence it was ascertained, by a message from Mr. Lester, that two subscribing witnesses were necessary. It became the subject of conversation in the room in the presence of Mrs. Hatcher. To use the language of the witnesses. it was talked about that it was necessary for Clarke to sign. A messenger was at once dispatched for Clarke. When he returned and entered the room Dr. Grymes remarked it was necessary for him to sign, saying to Clarke, you were present and saw Mrs. Hatcher sign it, and heard her acknowledgment when I signed it? He said yes, he was. He was told it was necessary to sign in the presence of Mrs. Hatcher. The will was taken from a chair and subscribed by Clarke within a few feet and directly in front of her. Dr. Grymes says he is satisfied she was then entirely conscious; that she could see, and knew what we were doing when he signed; that he had a conversation with her just before Clarke came in, and that she retained her consciousness for some time after the will was subscribed by Clarke. He took it for granted on calling for Clarke she wanted her will, which disposed of her property, properly attested, and if she disapproved of the attestation by Clarke she was in a condition to show her disapprobation if she. chose.
Clarke, on the other hand, says her eyes were set in death. He admits, however, “he did not know anything about her mind at the time.” “He had reason to think it was not good.” The reason he assigns is she did not *say anything when he signed and when the will was read to her. He further says that when Dr. Grymes and Mr. Cheatham called upon him to sign, Mrs. Hatcher could hear — everybody could hear— and if she was conscious, she must have known they called upon him to sign the paper as her will; and she was in a position to see, as he was in front of her. only about three feet from her. The testimony of Clarke, it will thus be seen, does not show Mrs. Hatcher’s want of capacity or unconsciousness at the time. It merely suggests a doubt upon that subject. Whatever weight it might otherwise have had in this case is impaired, if not wholly destroyed, by the circumstances surrounding him. In the first place, it is apparent he is a very illiterate witness, whose mere opinion upon a question of testamentary capacity is of but little value. In the second place, by his act of subscribing the will, he solemnly attested the capacity of the testatrix, and when he undertakes to invalidate the will his testimony is to be received with suspicion. It was said, in Kinleside v. Harrison, 2 Phill. R. 449, that no fact stated by such a witness can be relied on when he is not corroborated by other witnesses.
In the third place, it is certain that his testimony on the trial was directly at variance with his previous statements made shortly after the will was executed. He is proved to have said, on several occasions, that he agreed with Dr. Grymes in regard to the acknowledgment of the will by the testatrix, and also with regard to her condition when he subscribed the will. Either he had been tampered with or he had forgotten what had occurred at the time of the execution of the will.
I do not accuse him of falsehood wilfully uttered; his conduct shows the wisdom of the rule which authorizes the material facts to be proved by one of the subscribing witnesses. or even by any other competent testimony, *a-nd if it were otherwise the proof of a duly attested will might be defeated by the forgetfulness or perjury of some of them.
On the other hand. Dr. Grymes was at the time, and had been for several years, Mrs. Hatcher’s family physician. He had been in constant attendance upon her during the three weeks’ illness preceding her death. He is proved to be a man of high character and unquestioned veracity. Tn every view his evidence is entitled to the highest consideration.
In Burton v. Scott, 3 Rand. 399, 403, Judge Carr said: “The opinion of a witness as to the sanity of a person, depends for its weight on the capacity of the witness to judge, and his opportunity. Physicians are considered as occupying a high grade on such questions, both because they are generally men of cultivated minds and observation, and because, from their education and pursuits, they are supposed to have turned their attention more particularly to such subjects, and therefore to be able to discriminate more accurately, especially a physician who has attended the patient through the disease which is. supposed to have disabled his mind.”
The evidence of T. M. Cheatham confirms that of Dr. Grymes in every particular. *36 Throughout they fully concur in their statements and recollection of the occurrences at the time the will was signed and acknowledged by Mrs. Hatcher, and when it was attested by Clarke. Speaking with reference to the latter occurrence, this witness says: “I saw nothing to lead ñre to believe she was not conscious then. She had been talking just before he (Clarke) came; it was talked about the necessity of Clarke signing in her presence; don't know whether she engaged in the'discussion; my conclusion and impression were that she heard the discussion, and that Clarke was sent for with her approbation and according to her wishes.”
*It is very true that Mr. Cheatham is a devisee under the will, and that fact detracts somewhat from the force and value of his statements. But his conduct throughout seems to have been characterized by good sense and' absolute fairness. His testimony is remarkably clear and consistent, and bears the impress of truth.
We have, therefore, the evidence of two competent witnesses (one of them the family physician) in support of the capacity of the testatrix, and the formal execution of the will. We have proof of that capacity in the intelligent conversation of the .testatrix but a few minutes before the attestation of Clarke, and all the presumptions in favor of its continuance. Against all this, we have the doubtful opinions of another witness in contradiction of his previous opinion, expressed soon after the will was executed. Here, then, is a will executed in conformity with all the requirements of the statute, signed and acknowledged in the presence of two witnesses, whose attestation was in the presence of the testatrix.
If it is to be defeated it is solely upon a mere presumption that the testatrix was in an unconscious state at the time the last attesting witness subscribed his name. This presumption is based mainly on the fact that she did not speak at the time, or request the witness to attest the will.
The cases are numerous in which wills have been established although the testator did'not request the witness to sign — when the request was made by some one in his presence, and therefore, presumably with his consent.
In the case of Inglesant v. Inglesant, 3 Law Reports, P. & D. 1872-75, p. 172, the testatrix was an old lady ninety years of .age, whose will was executed in the house of a Mrs. Lee, and the question there, as here, was, whether the witness had attested the will at the request of the testatrix. Sir J. Hannen, in commenting upon the evidence, feaid: “The peculiarity of this case is, that *the two attesting witnesses agree in this, that the signature of the deceased was put to the will before one of them came into the room. Both agree that Mrs. Lee. in the presence of the testatrix, upon the second witness coming into the room, requested him to put his name under the name of the testatrix. Both also agree that the testatrix did not say anything or do any act in reference to the will after the two witnesses were there, and consequently the question turns upon this, Whether the words used by Mrs. Lee can be taken to be the words of the testatrix.” After some discussion of the authorities, after citing and commenting' upon the case of Faulds v. Jackson, decided by Lord Brougham, the learned judge proceeds to say, “That case, therefore, is, as nearly as can be, parallel with the present, and the only question is, Is there evidence which leads me to conclude that the words used by Mrs. Lee were heard by Mrs. Inglesant, the testatrix? If so, the case applies. As the evidence stands, I must adopt the view that the words were heard by the testatrix. Mrs. Greaves had just before been conversing with her, and no question has been put to any witness to raise a doubt that the testatrix did hear the words used by Mrs. Lee. Moreover the execution was undoubtedly in furtherance of the wishes expressed by the testatrix when she sent for the witness.”
In Rutherford v. Rutherford, 1 Denio R. 33, it was held that the jury might have found, a sufficient request to one of the witnesses. where it was made by the draftsman of the will, in the presence of the testatrix. In Peck v. Cary, 27 New York R. 9-10, Denio, C. J., said: “Thereupon Morgan, the draftsman of the will, and who was attending to its execution, called upon three persons who were within hearing, to come forward and witness the will, and they came. I think they should be held to have signed at the request of the testatrix.” See also Nelson v. McGiffert. 3 Barb. Ch. R. 163.
*In Smith v. Smith, 2 Lansing R. 266, the supreme court of New York said: “The witnesses signed, knowing what paper they were attesting. The testatrix was present when they signed, and made no objection. The person whom she had employed to draw the will requested the witness to sign, and the request being made in her presence, is, in law. her request.” See also Moore v. Moore, 2 Brad. Surrogate R. 261. Some of these are decisions by the highest courts of New York, where there is a statute expressly requiring that the witness must attest the will at the request of the testatrix.
The authorities, I think, are almost uniform in holding that a request made by a person in the presence of the testatrix will be held to be the request of the latter, if no objection is made; and an attestation thus made is presumed to be with the concurrence and wishes of the testatrix. See Williams on Ex’ors, top p. 117, marg. 99, and cases there cited. Rogers v. Diamond, 13 Ark. R. 475; Trustees, &c., of Auburn v. Calhoun, 25 New York R. 422.
In the present case it is true that the testatrix at no time requested Clarke to attest her will — neither did she request Dr. Grymes to do so until she was asked the question. It is verv probable she did not know that a subscribing witness was necessary, and no doubt she supposed, as did the others, that the attestation of one was sufficient, until the subject was discussed ir> her presence. There is no doubt she heard Mr. Cheatham say to *37 Clarke he could also act as a witness. There is no doubt she was well aware of the information received from Lester, that another witness was necessary, as it was the subject of conversation about the time she is proved to have conversed with persons in the room. There is no doubt that when Clarke entered the room she heard Dr. Grymes and Mr. Cheatham request him to sign the will — she heard and she understood all this if she was conscious — *and that she was conscious, I have already attempted to show from the testimony of unimpeached witnesses, and from the surrounding circumstances; that all the witnesses and friends so thought at the time, is evident from the fact that Clarke was requested to take his position directly in front of Mrs. Hatcher, so that she could plainly see him subscribe the will.
An unfavorable inference is sought to be drawn from the remark made by Dr. Grymes to Clarke, that Clarke was present when Mrs. Hatcher signed the will and heard her acknowledgment. It is said that Clarke was sent for and reminded of what had occurred in his presence, because it was well understood that Mrs. Hatcher was then in an unconscious state. The evidence shows that although Clarke did not actually sign his name, he was considered as a witness to the transaction — he was requested to witness the reading of the will. He was not then requested to sign because it was thought that one subscribing witness was sufficient; but when it was ascertained that two were necessary, it very naturally occurred to them, that as Clarke had witnessed the previous proceedings, including the reading, the signature and acknowledgment, he was the proper person to attest them by the actual subscription of his name.
This view is borne out by the evidence, and is consistent with the integrity of the witnesses.
The other view supposes they are not only guilty of perjury, but that they conspired to use Clarke as an instrument to accomplish a gross and palpable fraud.
Again, it is said that Cheatham, the chief legatee, was the draftsman of the will. That circumstance does not invalidate the will; it simply imposes upon the court the duty of increased vigilance in seeing that the will was fairly executed, and that it does in fact carry out the wishes of the testatrix with respect to her property. See Riddell v. Johnson, 25 Gratt. 152. Tt is perfectly certain *that this will is in conformity with the wishes of Mrs. Hatcher. It is the precise disposition she desired to make of her property. She had no children or descendants — her relations were very numerous, scattered over several states, the names and even residences of many of them, probably unknown to her — for most of whom she could have no sort of affection. Her property. divided among so manv. could be of little value to anv one. Nothing was more natural than that she should prefer to give it to those who had been kind to her, and who were bound to her by the ties of affection, blood and long continued service and devotion.
Very unexpectedly to herself and friends, she was suddenly taken dangerously ill. So soon as she was apprised of her condition, she manifested the most eager wish to make her will. She would not be denied or delayed. No one had suggested’it; no one had even hinted at any special bequest; it was written as she dictated, without comment or remark. And when, as she supposed, the instrument was complete, she quietly composed herself to die. If her wishes are to be defeated by the courts, it will be upon an inference. Lord Mansfield once said that in such a case as this, the courts lay hold of a very light presumption.
In Van Alst v. Hunter, 5 John. Ch. R. 169, Chancellor Kent, after quoting from Voet, in his Commentaries on the Pandects: “Licet enim non santi tantum sed et in agone mortis positi seminece ac balbutiente lingua voluntatem promentes, recta testamenta condant si modo mente ad hunc valeant,” proceeds to say: “It is one of the painful consequences of extreme old age that it ceases to excite interest, and is apt to be left solitary and neglected. The control which the law gives to aman oyer the disposal of his property is one of the most efficient means which he has-in protracted life to command the attention due to his infirmities. The will of such an aged man ought *to be regarded with great tenderness, when it appears not to have been procured by fraudulent means, but contains those very dispositions which the circumstances of his situation and the course of the natural affections dic- , tated.” I think these just and noble sentiments fully apply to the case in hand, and' I am for admitting the will to probate.
CHRISTIAN and BURKS, J’s, concurred in the opinion of Staples, J.