# Richmond.

## Shacklett v. Roller and Others.

### November 16, 1899.

1. Wills — *Disappearance—Revocation—Presumption—Burden of Proof.*—
Where it appears that a person has made a will which cannot be
found after his death, the *prima facie* presumption is that he
destroyed it, *animo revocandi,* and the burden of showing some
other cause for its disappearance is on those who seek to estab-
lish it.

2. Appeal and Error—*Objection to Evidence for First Time.*—The
question of the admissibility of the declarations of a testator as
to the existence or the revocation of his will cannot be raised for
the first time in this court.

3. Wills—*Disappearance—Declarations of Testator.*—The declarations of
a testator after he has made his will, as to its continued existence
or destruction, where it cannot be found after his death, if admis-
sible at all, are deemed of great 'weight when voluntarily made to
disinterested persons.

4. Wills—*Capacity—Evidence — Physicians.*—Physicians, and especially
family physicians, occupy a high grade on. the question of testa-
mentary capacity.

5. Wills—*Destruction—Capacity of Testator—Evidence—Lost Papers.*—
In a suit to set up a will which has been destroyed, it is not
sufficient to show that it *may have been* in existence after the tes-
tator lost capacity to revoke it, but it must appear that it *was*
in existence after that date. Courts of equity do not set up lost
papers except where it is clearly shown that it should be done.

Appeal from a decree of the Circuit Court of Rockingham
county, pronounced October 27, 1898, in a suit in chancery,
wherein two of the appellees were the complainants, and the
appellants and others were the defendants.

*Reversed.*

The opinion states the case.

*Eppa Hunton, Jr.*, and *Sipe & Harris*, for the appellants.

*W. Liggett, Jas. B. Stephenson*, and *Marshall McCormick*, for the appellees.

BUCHANAN, J., delivered the opinion of the court.

The object of this suit was to set up or restore the will of Samuel Shacklett, deceased, which it was alleged he had made several years before his death and afterwards destroyed in the last year of his life, when he was mentally incompetent to revoke a will. The appellant, who was a defendant in the trial court, admitted in her answer the execution of a will and its destruction by the testator, but denied that it was destroyed when he was incapable of revoking it, or that its contents were correctly stated in the bill.

Where it appears that a person has made a will which cannot be found after his death, the presumption is that it was destroyed by the testator *animo revocandi*. This is especially true where the will is traced to his possession, and never traced out of it. *Appling* v. *Eades*, 1 Gratt. 286; 2 Tucker's Com. 420; 1 Williams on Ex'ors. (6th Am. Ed.) 195; *Lawson* v. *Morrison*, 2 Am. Lead. Cases, 511; Thornton on Wills, sec. 56.

This presumption, however, is only *prima facie*, and may be rebutted; but the burden is upon those who seek to establish such an instrument to assign and prove some other cause for its disappearance. Thornton on Wills, sec. 58; *Lawson* v. *Morrison*, 2 Am. Lead. Cases, 510.

The cause assigned in this case is that the testator destroyed his will in the last year of his life, and at a time when he was mentally incapable of revoking it. Does the evidence show this? This is the first question, and if it be answered in the negative, the only question, that it will be necessary to consider in disposing of this appeal.

The testator's mental condition was unquestionably good prior to August, 1885, when he had an attack of typhoid fever. As to the condition of his mind from that time until his death, June 30, 1886, the depositions of fifteen witnesses were taken, and a number of books and papers were filed for the purpose of showing that numerous transactions had been conducted by him, or in his name, during that period.

It would be impossible in an opinion of reasonable length to analyze or discuss in detail all those depositions and documents, and, if it could be done, it would be a useless consumption of time, as almost every case of this kind must depend upon the particular circumstances attending it. The facts of one case seldom serve to illustrate or elucidate another.

It is sufficient to say, after a very careful examination of this mass of evidence, that we are of opinion that the complainants have failed to show that the testator was mentally incompetent to revoke a will prior to about March 12, 1886, when his wife was seriously injured by a fall. Did he destroy his will after that time?

The record does not show when the will was made, nor when it was destroyed. General Roller, the father and next friend of the infant complainants, deposed that he saw and read it in the year 1881 or 1882; and it further appears from his deposition that the will was made several years before that. Miss Boyers, another witness for the complainants, who was in the habit of visiting in the family, stated in her deposition, that some time in the year 1884, she heard a conversation between Samuel Shacklett, who was not very well at the time, and his wife, in reference to his affairs, in which he said that he had his business fixed as he wanted it. Miss Fannie Shacklett, one of the complainants, testified that she saw the will and read a part of it during the last year of the decedent's life. She was unable to fix the time definitely, but stated that it was some time after the testator had an attack of typhoid fever (which was in August and September,

1885), and several months before his death; she thought in the early spring or late winter of the year 1886. She only claimed to have seen the will on one occasion, and her brother, one of the defendants, testified that she told him soon after their grandfather's death she had seen it several years before that, but did not read it.

Dr. Hopkins, the family physician, who was called by the defendants, testified upon this point as follows: " Did you ever have any conversation with Samuel Shacklett in reference to his will? If so, please state where it occurred, and what was said? " Answer: " Yes; it occurred in his house, in one of the rooms of the second story, in the east side of the house. He was in that room, sitting in a chair by a table, on the north side of the room, with an account book on the table of some kind, papers, and pen and ink around him, when I went into the room. He asked me to take a seat, insisted on it, rather; said he wanted to talk to me about some things, and mentioned his will. He said he had made a will with which he had become dissatisfied, and that he had destroyed or burnt it—I don't remember which word he used—and that he did not intend to leave a will; that the law made a good enough will for him; that it prevented lawsuits and litigation which often occurred when wills were made. That is about the substance of it."

Question 4. " When did this conversation occur? " Answer: " I cannot fix the date. I cannot determine the time, not certainly, but it may have been the time we made that settlement " (about which he had testified in the earlier part of his deposition), " the 10th day of November, 1885, or it may have been after that."

Question 5. " What was the condition of his mind at the time of his conversation? " Answer: " I had no doubt of the soundness of his mind at that time."

Another witness for the defendants, Abner Shacklett, a nephew of the decedent, by whom he was reared, and with whom

he had been in business, testified that some time before the decedent's death, it might have been several years, he did not recollect how long, he had a conversation with his uncle, in which he told witness that he had made a will; that it was in his secretary, and that he might see it if he desired; that the testator stated, after witness told him he did not have time to read it then, that he did not know about leaving a will; that the law made about as good a will as he could; that in a subsequent conversation, several months, four or five months before decedent died, witness told him he wished to quit business, and was thinking of making a will; that when he mentioned the fact that he was thinking of making a will, the decedent's wife, who was present during the conversation, said Mr. Shacklett had destroyed his will, to which remark of his wife the testator made no reply; that he saw nothing wrong with his mind at that time.

Henry V. Strayer, an attorney at law, another witness for the defendants, stated that whilst he was mayor of Harrisonburg, from August, 1880, to August, 1881, he thinks in the latter part of his term of office, he had a conversation with, and at the request of, the testator, in which the latter asked him what he thought of the will which the law made for a man, to which he replied that that depended upon the conditions which surrounded a man, but, as a rule, the law made a very good will; that the decedent then stated he had come to the conclusion the law made the best will for a man that could be made, and gave as some of his reasons for that view that wills were liable to be contested, which engendered bitterness in families and led to expensive litigation, mentioning as an instance of it the contest over the will of a citizen of that county.

It is insisted that the declarations of the testator that he had destroyed his will are not admissible evidence to show its revocation. Upon this question great jurists have differed, and there is much conflict in the cases. Whatever be the correct rule upon

the subject is immaterial in this case, as the question does not properly arise.

In the court below, both sides relied upon the declarations of the testator, the complainants to show that the will was still in existence, and the defendants to show that it had been revoked. Neither side objected to such evidence when the depositions were taken, nor afterwards, as far as the record shows. It is too late now to raise the question of their admissibility for the first time in this court. *Burkholder* v. *Ludlum*, 30 Gratt. 255; *George Campbell & Co.* v. *George Angus & Co.*, 91 Va. 438. The only question we have to deal with is their weight or value.

The ground upon which such evidence is held to be inadmissible by those courts which take that view of the question is that it is mere hearsay, and does not come within any of the exceptions to the general rule which excludes hearsay evidence, and not because such evidence is intrinsically of no value.

The declarations of a testator, after he has made his will, as to its continued existence, its contents, or its revocation, where the will cannot be found after his death, is recognized under certain circumstances as entitled to great weight, not only by judges who think such evidence admissible, but also by those who reject it. Chief Justice Cockburn, with whom the majority of the court agreed in the celebrated case of *Sugden* v. *St. Leonards*, 1 Probate Div. (Law Rep.) 154, that the declarations of a testator as to the contents of his will were admissible, said: " That morally, such statements and declarations are entitled to the greatest weight cannot be denied where no doubt exists of their sincerity. * * * *" Lord Mellish, one of his associates in the same case, who held that such evidence was not admissible, said: " There is no doubt that by rejecting such evidence we do reject a most valuable source of evidence."

The value of such declarations depends, of course, upon the circumstances under which they are uttered. If made to silence importunity, or to elude questions, or avoid annoyance, from

those who take upon themselves to judge of their own claims upon the testator, they would be of much less value than where made without solicitation to persons who have no interest in what disposition the testator intends to make or has made of his property. The declarations of the testator in this case that he had destroyed his will, and those of his wife in his presence that he had done so, to which he gave his assent by his silence, would seem to be entitled to very great weight. He could have no motive, so far as the record shows, for deceiving Dr. Hopkins, or Abner Shacklett. One·was his lifelong friend and trusted physician; the other was his nephew, whom he had reared, and at one time his partner. Neither expected to be benefited by his making or his not making a will. It cannot be believed that he sought a conversation with Dr. Hopkins that he might tell him a lie, or that he wished to act a lie to Abner Shacklett, and leave him under the impression that he had no will when he had, and that, too, when his nephew was talking with him, if not consulting him, about the propriety of his making a will himself, or that he was willing to allow his wife, who had been provided for by a marriage settlement, and had no further interest in his estate, to believe and tell others that he had destroyed his will, when in fact he had not. That these declarations that he had revoked his will were true, is not only rendered highly probable from the circumstances under which, and the person to whom they were made, but by the further fact that they were in accordance with his previously expressed opinions to H. V. Strayer and Abner Shacklett, that the law made about as good a will for a man as he could make himself.

It is argued that the same reasons which induced him to make a will continued to the end of his life, and from this it is to be presumed or inferred that he must have destroyed it when of unsound mind. The principal reason or motive assigned for his making the will was his declared purpose that his son's wife, whom he disliked, perhaps hated, because of her unkindness,

real or supposed, to his wife and his grandchildren, Fannie and Buford Shacklett, should not have any part of his estate. General Roller says that the testator told him when he showed him his will, in 1881 or 1882, that he had written it in the way that he had in order to carry out that purpose.

By that will he only gave his son a life estate in his large property, the greater part of which consisted of personalty. This provision for his son, between whom and his father there existed the kindest relations, and who were to each other all that a father and son ought to be, as the record shows, was an unnatural one, and the reason for it being formed, not upon any fault of the son, but upon hatred for his wife, it is not at all strange or improbable, as the testator approached the end of his life, that he should have become more charitable towards those who had wronged him, or those dear to him, or at least that he should have been unwilling to do injustice to his only child by the last act of his life, in order to show his dislike for another.

Another argument relied on to show that the testator did not intend to revoke his will, and therefore he must have destroyed it after he lost his mind, is, that his son believed he left a will, made search for it and took steps towards setting it up. The evidence does show that his son made search for the will, and there is also evidence tending to show that at one time he may have believed that his father left a will, and that he was considering the question of setting it up, but his subsequent conduct shows that he became fully satisfied that his father died intestate, or at least that he did not believe he left any such will as is attempted to be established in this case. He not only refused to approve the bill prepared by his son-in-law soon after his father's death for setting up the will, but returned it without comment, and ever afterwards avoided his son-in-law as far as possible, and had little or nothing to do with him or his family, and in a very short time after he returned the bill qualified as his father's personal representative, took possession of his entire estate, real and

personal, made sales and conveyances of portions of the former, and treated and used the whole of it as his own. Henry Shacklett is shown by the record to have been a man of high character, of unquestioned honesty and integrity. Being such a man he could not have appropriated his father's estate as he did if he had believed that his father had died testate. He could not have used as his own what he knew belonged to his children and his grandchildren, and been engaged in defrauding purchasers by selling them lands to which he could not make title.

It is insisted that his will was shown to have been in existence only a few months before the testator's death, and after his mind had become so impaired that he could form no intent to revoke it. Miss Fannie Shacklett does testify that she saw the will, and read part of it, some time after his attack of fever, several months before his death; she thought in the early spring or late winter of 1886. She only claimed to have seen it on one occasion. She is a deeply interested witness; is uncertain as to the time she saw the will, and is shown by her brother, also an interested witness, to have made a different statement as to the time she saw it. But if it be true that she did see it after her grandfather had the fever, and not several years before, as her brother testified she told him, it does not clearly appear that she saw it after the 12th day of March, 1886, before which time, as we have seen, the evidence does not show that the testator was mentally incompetent to revoke it.

Dr. Hopkins testified that he had no doubt of the soundness of the testator's mind when he told him he had destroyed his will, and gave his reasons for it, which would tend very strongly to show that Miss Shacklett must have seen the will prior to that time, and when the testator was of sound mind. Dr. Hopkins was, as before stated, the testator's family physician. He had been in frequent attendance upon him from August, 1885, until his death in June, 1886. The record shows that he is a man of high character, and unquestioned integrity. It is true he was an

old man when he testified, and could not give definitely the dates of particular occurrences without reference to memoranda made when they occurred, but about whose accuracy he had no doubt. But as to the testator's mental soundness when he told him that he had destroyed his will, he testified positively and without any reference to memoranda. His evidence upon that subject is entitled to the highest consideration. Physicians, as this court has so often said, are considered as occupying a high grade on such questions, both because they are generally men of cultivated minds and observation, and because, from education and pursuits, they are supposed to have turned their attention more particularly to such subjects, and therefore to be able to discriminate more accurately, especially a family physician who has attended the patient through the disease which is supposed to have disabled his mind. *Burton* v. *Scott*, 3 Rand. 399, 403; *Parramore* v. *Taylor*, 11 Gratt. 220, 228; *Simmerman* v. *Songer*, 29 Gratt. 9 and 24; *Cheatham* v. *Hatcher*, 30 Gratt. 56, 65; *Montague* v. *Allen*, 78 Va. 592, 597; and *C. & O. Ry. Co.* v. *Mosby*, 93 Va. 93, 98.

It is not sufficient in a case like this to show that the will *may have been* in existence after the testator's mind had become so impaired that he could not revoke it; but it must appear that *it was* in existence after that time. Courts of equity do not set up lost papers except where it is clearly shown that it should be done. *Thomas* v. *Ribble*, (Va.), 24 S. E. 241; *Barley* v. *Byrd*, 95 Va. 316; Thornton on Wills, sec. 71.

We are of opinion that the record does not show that Samuel Shacklett was mentally incompetent to revoke his will when he destroyed it, and that the Circuit Court erred in so holding.

The decree appealed from must be reversed, and the bill dismissed.

*Reversed.*