# Richmond

FLORENCE LEE TATE v. J. ROBERT WREN, ET AL.

November 25, 1946.

Record No. 3089.

Present, Holt, C. J., and Hudgins, Gregory, Eggleston, Spratley and
Buchanan, JJ.

The opinion states the case.

*S. B. Campbell* and *C. E. Hunter,* for the appellant.

*Vernon C. Barker, Henry Roberts* and *W. V. Birchfield,* for the appellees.

GREGORY, J., delivered the opinion of the court.

Colonel James D. Tate, late of Chilhowie, Virginia, died on December 21, 1941, in Savannah, Georgia. He and his wife, Florence Lee Tate, were spending some time in Savannah, expecting to continue their journey to Florida, at which latter place they expected to spend the winter. Col. Tate left surviving him his widow, and four nephews, B. T. Wren, W. H. Wren, J. H. Wren, J. Robert Wren, and a niece, Edith J. Whitney. There were no children. The nephews and the niece were children of a deceased sister of Col. Tate, and they were his nearest blood relatives.

A controversy arose between Mrs. Tate and the nephews and niece as to whether or not Col. Tate died testate. After his death, and after a complete search had been made, no will was found. The controversy finally culminated in this suit which was brought by J. Robert Wren against Mrs. Tate and others, asking that the court, by a proper decree, establish the contents of an alleged holographic will of James D. Tate, executed in 1939. He prayed that this alleged will be set up and established as the last will and testament of James D. Tate, deceased.

By amendments and answers it was alleged and averred that if the 1939 paper could not be established as a will, a certain paper, drawn in 1933 and alleged to have been executed by Col. Tate, should be established as his last will and testament. Fraud was charged against W. A. Wolfe, cashier of the Marion National Bank. Exceptions to the bill, a demurrer, and a cross-bill were filed.

This suit was instituted and conducted under the general chancery jurisdiction of a court of equity as distinguished

from the statutory proceeding provided for under Code, sec. 5259 (Michie), where a jury is ordered to ascertain whether any, and if any, how much of what was so offered for probate be the will of the decedent.

An issue out of chancery was awarded by the chancellor and a jury was empaneled for the purpose of ascertaining whether or not Col. Tate died testate. The jury, by its verdict, found that the 1933 paper was the valid will of James D. Tate, and that the copy of the same presented in the evidence was a true copy. They also found that the disappearance of said will was due to some other cause than the revocation thereof by James D. Tate, and in establishing this disappearance, the jury found "no evidence involving, fraudulently or otherwise, William A. Wolfe."

The court, after due consideration, carried the verdict of the jury into effect by its decree. From that decree this appeal was allowed.

The estate consisted of more than four hundred thousand dollars in personal property, and in excess of one hundred thousand dollars in real estate. In the event of intestacy, Mrs. Tate would take an absolute estate in the personal property and an estate for life in the real estate, with remainder to the niece and nephews.

After the search for a will had been conducted without finding one, Mrs. Tate, together with Marion National Bank and Dr. William T. Graham, of Richmond, were appointed and qualified as administrators of the estate on January 9, 1942. They continued from their appointment and qualification to administer the estate until the original bill was filed in this cause on December 29, 1943.

One James D. Mahoney, who had been reared by Mr. and Mrs. Tate, and who appeared as a beneficiary in both of the alleged wills filed a petition as late as April 6, 1945, in which he sought to have the alleged will of 1933 established as the last will of the decedent if the alleged will of 1939 could not be established.

The principal question in the case was whether the court was authorized to establish as a last will a paper admittedly

in the continuous and exclusive possession of the decedent when its disappearance had not been accounted for other than through the presumption that the decedent himself destroyed the paper with intention to revoke it.

Col. Tate was and had been for many years a prominent citizen of Smyth county, a man of large business affairs, and interested in many of the business undertakings in his section of the State. He was also a prosperous farmer, careful and prudent, and had amassed a considerable estate.

The niece and nephews had lost their parents when they were quite young and Col. Tate, his mother, and his wife, had assisted in rearing them.

In November, 1933, Col. Tate called upon B. L. Dickinson, an attorney-at-law in Marion, to prepare a will for him. This was done, and he executed this will in the presence of two witnesses. By the terms of this paper, as shown by a typewritten copy, he provided for the upkeep of a cemetery lot, a bequest to Tate's Chapel, and a legacy to an old employee. All of the remainder of the estate was given to the Marion National Bank as trustee, to be held by it in trust for the benefit of his widow, Florence Lee Tate, during her life, and twenty-one years after her death the estate was to be divided as follows: To B. T. Wren, ten per cent; to W. H. Wren ten per cent; to J. H. Wren twenty per cent; to J. Robert Wren ten per cent; to Edith J. Whitney twenty per cent; to James D. Mahoney twenty per cent; and to Emily Jeffry Williams ten per cent. During the period of twenty-one years after the death of Mrs. Tate the income was to be distributed to the beneficiaries in like proportions. Mrs. Williams was the niece of Mrs. Tate, but no blood relation of the decedent.

On account of a controversy between him and an officer of the Marion National Bank, Col. Tate was considering changing his executor, that bank having been named as the sole executor. Mr. Wolfe, the cashier of the bank, implored him not to make the change.

Some time in the early spring of 1939, he began to consider making a new will and preparing it in his own hand-

writing. He again approached Mr. Dickinson and requested that Mr. Dickinson draft a form or typewritten paper which he, Col. Tate, would take home with him and from it make his will in his handwriting. Mr. Dickinson stated in his testimony that Col. Tate said when this draft was delivered to him, "And when I get it to suit me I will write it out in my own handwriting."

Although the form of will prepared by Mr. Dickinson was the result of considerable thought and many conferences, it was never seen again.

Mr. Dickinson testified that after he had delivered this form to Col. Tate, he inquired as to what would be the devolution of his estate in the event he left no will. Mr. Dickinson informed him of the law on the subject and prepared a memorandum in which he described the course of descent under the Virginia statute. This memorandum was found in Col. Tate's papers after his death and properly identified by Mr. Dickinson as the memorandum delivered by him to Col. Tate.

Mr. Dickinson, at the time he conferred with Col. Tate about preparing the 1939 paper, informed him that under the United States statutes the Marion National Bank, the named executor, could not vote the stock in that institution belonging to the estate and that it would be necessary to confer the voting power upon a co-executor. This suggestion was followed in the drafting of the paper. Mr. Fred C. Buck, president of a bank in Abingdon, Virginia, was named as the co-executor.

Col. Tate attended the Bankers Convention in Bermuda in May, 1939, and there conferred with Mr. Fred C. Buck. According to the testimony he told Mr. Buck, "It may surprise you what I am going to tell you, but I have drawn my will and have named you co-executor along with the Marion National Bank." The evidence also discloses that he told Mr. Buck upon this occasion, "I have written this will in my own handwriting." He then made reference to some of the provisions of the will, including the trust fund for Mrs. Tate, and the remainder to his nephews and niece,

and finally told Mr. Buck, "You will find it in my box at the Marion National Bank."

In April, 1941, Col. Tate met Mr. Buck at the Bank of Glade Spring, and there confirmed what he had told Mr. Buck in Bermuda. He added that he was uneasy as to whether the provision made for Mrs. Tate in the holographic will would be sufficient for her needs in view of the increased taxes, and he stated that he was considering making a change in his will so that she would be guaranteed an income of $1,000 a month even if a portion of it had to be paid from the corpus of his estate.

There were a number of declarations shown to have been made by Col. Tate regarding his 1939 will which would tend to support the view that it was in existence and in the lock box in the bank at Marion at the time of his death. None of them had reference to the 1933 will. For instance, in 1941, Col. Tate told Mrs. Jones in Alexandria, "I have written my will. I wrote it like that (indicating), because when you write it in your own handwriting nobody can ever doubt whether it belongs to you." Louvenia Campbell, the cook at Col. Tate's home, stated that Col. Tate showed her the paper of 1939 and stated to her, "This is my will". She testified that she was familiar with Col. Tate's handwriting, and that the will was written in his handwriting and signed by him, and in it was a provision made for her benefit. Mr. B. B. Huff stated that when he jocularly inquired if Col. Tate was writing his will at the time he saw him sitting up in bed, Col. Tate replied, "No, he had already written his will and fixed up all of his affairs, and he had two good, young men to handle his affairs, Fred Buck and Mr. Wolfe, of Marion." This declaration was made in the summer of 1941.

The 1933 will was not written in Col. Tate's handwriting. It was a typewritten paper executed in the presence of two attesting witnesses.

Just a short time before Col. Tate left for Richmond on his way to Florida, he went to the Bank of Marion on at least two occasions and opened his lock box. On the last

occasion he left a key to it with Mr. Wolfe, the cashier of the bank, for the purpose of opening it and sending such securities to Col. Tate as he might call for.

Col. Tate left his home some time in October or November, 1941, and stopped off in Richmond. Later he went on to Savannah, and was a guest at the DeSoto Hotel, attended by two trained nurses. Mrs. Tate joined him there and they had expected to continue on to Florida after Christmas. While in Savannah Col. Tate's health improved and the doctor who examined him reported that he was making excellent progress, but two or three days before December 21st he was stricken with a severe attack and passed away on December 21, 1941.

Approximately two days before he was stricken he was engaged in writing a holographic will in which he wrote that he was leaving all of his estate, both real and personal, to his wife in fee simple, excepting a small bequest to the trustees of Tate's Chapel. In it he appointed the Marion National Bank and Fred C. Buck as executors, but this will was never completed nor was it ever executed by him. However, it is a fact which discloses that Col. Tate was not satisfied with the will he is alleged to have drawn in 1939 in his own handwriting.

Most of the evidence introduced at the trial pertained to the 1939 paper and its alleged fraudulent destruction. Effort was made to prove that Mr. Wolfe, the cashier of the bank, had fraudulently concealed or destroyed this paper. The verdict of the jury acquitted Mr. Wolfe of these charges and established the will of 1933 as being the last will and testament of Col. Tate.

The defendants in the court below introduced no evidence.

The record discloses that Col. Tate had strong affection for his niece and nephews, and that he was very fond of his friend, James D. Mahoney. However, one of the substantial changes made in the 1933 will by the form prepared by Mr. Dickinson was that B. T. Wren was omitted as one of the beneficiaries.

After a year had elapsed from the date of the qualification of the administrators, they delivered a substantial part of the personal property to Mrs. Tate in her own right as sole distributee.

Mrs. Tate, the nephews and niece treated the estate as though Col. Tate had died intestate, and the real estate, with the exception of the home place, was sold. Mrs. Tate sold her dower interest to the nephews and the niece, and they, in turn, treating themselves as heirs of Col. Tate, and asserting that he had died intestate, sold these properties.

At the conclusion of the proponents' evidence the opponents, who are the appellants here, moved the court to strike it out on the ground that it was not sufficient to sustain a verdict in favor of the proponents. The grounds stated as to the 1933 will were, "As to any evidence of the 1933 will, we ask the court to strike that because this will was traced to the possession of Col. Tate some nine years before his death and was never shown to have been out of his possession, and the presumption therefore is that the testator destroyed that will."

And as to the alleged 1939 will the ground of the motion was, "Also, because there is no satisfactory proof as to the contents of the 1939 will and no identification of the alleged 1939 will as the same paper which was introduced in the evidence of Mr. Dickinson, and there has not been sufficient proof of the identification of the copy of the alleged 1933 will, introduced in Mr. Dickinson's testimony." The motion was overruled.

There were many instructions offered by both sides but few were granted. We need not discuss these because we do not think the verdict and decree establishing the 1933 will are sustained by the evidence as a matter of law. This being our view of the case, the other assignments of error need not be considered.

The jury and the chancellor found against the existence of the alleged 1939 paper. Effort was made in the trial court to require the proponents to elect upon which will they would stand; whether the one of 1933 or that of 1939,

but the court refused to require an election. Even in this court it is apparent from the brief of the proponents and their cross-errors assigned that they still are unwilling to stand upon either paper alone, but insist that inasmuch as all the evidence for both is before this court it should exercise its powers under Code, sec. 6365 (Michie), and if the 1933 will has not been properly established this court is in position and has the power to establish the 1939 will under the record before us.

Such a position is unusual to say the least. For proof of the execution, loss, and contents of the 1933 will, and its establishment by the court as the last will of Col. Tate would nullify the claim that there was a 1939 will. On the other hand if the proof showed the due execution of the 1939 will, its loss, and contents, it would have revoked the 1933 will. A testator can have but one last will.

We think that our quest is ended when we determine whether or not the court below was correct in establishing the 1933 will. It decided against the 1939 will, as it reasonably might have done because there was not sufficient and satisfactory evidence of the contents of that will.

Reduced to its most elementary terms, the question we are called upon to answer is whether or not the 1933 paper was unrevoked and in existence at the death of Col. Tate. The burden of proof rested upon the proponents to establish by satisfactory evidence the due execution of the 1933 will, its loss, its contents, and that it had not been revoked. The due execution of the will and its contents were proven, but its loss was not. The proponents failed to prove that it had not been destroyed or revoked by Col. Tate himself. The most that was proven was that this 1933 will was not found after a diligent search after the death of Col. Tate. There was no evidence that it was fraudulently concealed or destroyed, or that it was ever out of Col. Tate's possession. Therefore, in these circumstances, the will having been traced to his custody, the law affords a presumption that Col. Tate destroyed the 1933 will with the intention of revoking it.

There are many authorities applying this principle. Perhaps one of the clearest statements is found in Wills and Administration, Harrison, Vol. 1, at pages 257 and 258. It is as follows:

"The presumption of law is that a will not found after the death of the testator was destroyed by the testator *animo recovandi*, especially if the will is traced into his possession and not traced out of it. But this presumption is a presumption of the fact and can be rebutted by satisfactory evidence, showing the existence of the will at the time when the testator was incapable of revoking it, or satisfactorily showing its destruction by some unauthorized agency. The evidence must show not that the will might have been in existence at a time when the testator was incapable of revoking it, but that it was in existence at that time. And so, too, it is not sufficient to show that the will might have been destroyed or stolen without the authority of the testator, but the evidence should show, with some clearness, the fact relied on; for a court of equity does not set up lost papers except where it is clearly shown that it should be done, and courts of probate are not less strict. The declarations of the testator, after he has made his will, as to its continued existence or destruction, when admitted at all, are deemed of great weight, especially if voluntarily made to disinterested parties. It is held by the decided weight of authority that such evidence is admissible.  * * * "

By the weight of authority the declarations of a testator are admissible to rebut the presumption of revocation where the will is traced to the testator's possession and is not found after his death. 79 A. L. R. 1498. Also by weight of authority the declarations of a testator under these conditions are admissible to strengthen the presumption of revocation where the will is not found at the testator's death. 79 A. L. R. 1499.

Virginia is in line with the weight of authority on these principles. In Digest of Va. and W. Va. Reports (Michie), Vol. 9, p. 1084, the rule is stated thus:

"Where it appears that a person has made a will which cannot be found after his death, the presumption is that it was destroyed by the testator *animo revocandi*. This is especially true where the will is traced to his possession, and never traced out of it. *Shacklett* v. *Roller*, 97 Va. 639, 34 S. E. 492; *Appling* v. *Eades*, 1 Gratt. (42 Va.) 286; *Jackson* v. *Hewlett*, 114 Va. 573, 77 S. E. 518. See *Malone* v. *Hobbs*, 1 Rob. (40 Va.) 346, 39 Am. Dec. 263; *Wheat* v. *Wheat*, 3 Va. Law Reg., N. S., 177, affirmed by divided court in 119 Va. 861, 91 S. E. 827.

"This presumption, however, is only *prima facie*, and may be rebutted (*Jackson* v. *Hewlett*, 114 Va. 573, 77 S. E. 518); but the burden is upon those who seek to establish such an instrument to assign and prove some other cause for its disappearance. *Shacklett* v. *Roller*, 97 Va. 639, 34 S. E. 492. * * *

"The declarations of a testator after he has made a will, as to its continued existence or destruction, where it cannot be found after his death, if admissible at all, are deemed of great weight when voluntarily made to disinterested persons. *Shacklett* v. *Roller*, 97 Va. 639, 34 S. E. 492."

*Jackson* v. *Hewlett*, 114 Va. 573, 77 S. E. 518, is strongly relied upon by the appellees. There the testator made declarations anterior to the will, coincident with it and subsequent to it, all tending to show an avowed purpose to leave his estate to his illegitimate daughter, Gertrude Jackson, and not to his daughter, Mary P. Brown. Just a short time before his death he reiterated this purpose and said that the will was in the drawer of the bureau in his room. His intention persisted all the time without change. There was no evidence that he was ever dissatisfied with his will. These declarations were held sufficient to overcome the presumption of revocation when the will could not be found after the testator's death.

When we examine the evidence we do not find that Col. Tate ever made any declarations of his continued satisfaction with and adherence to the 1933 will. His declarations

in effect were that he was not satisfied with it, desired to change it, and to write a new will in his own handwriting. These do not rebut the presumption of revocation; they support it. This distinguishes this case from *Jackson* v. *Hewlett, supra.*

Great reliance is also placed upon *Bowery* v. *Webber,* 181 Va. 34, 23 S. E. (2d) 766. There Pearl L. Webber filed her bill seeking to establish as the lost will of Annie J. Livesay, deceased, a paper dated May 27, 1939, in which the complainant was named as the sole beneficiary. There was an allegation that the testatrix had died on June 12, 1940, without having revoked the will but that the instrument had become lost or misplaced. The heirs were made defendants. The trial court held that the evidence was sufficient to establish the will and ordered it to be admitted to probate. From this decree the heirs appealed. The will and its contents, its execution and attestation were proven beyond question. The appellants admitted the sufficiency of the evidence but invoked the presumption of law that where a will is last traced to the possession of the testator but is not found at his death it is presumed to have been destroyed by him with the intention of revoking it. The question was whether or not the presumption was overcome by the evidence and it was answered in the affirmative. The evidence disclosed the deep affection of the testatrix for the beneficiary who was her adopted granddaughter, continuing over a long period and down to the death of the testatrix; the repeated declarations of the testatrix subsequent to the making of the will and only a short time before her death that the will had been made, was in existence and still in her possession, and that she had no affection for the appellants. In other words, the court held that the presumption of revocation had been overcome by the declarations of the testatrix.

In the case at bar there were no such declarations of the testator shown as to the 1933 paper, but just the reverse was shown, namely, that Col. Tate declared on numerous occasions that he had written a new will making several

changes. Thus he was not satisfied with the 1933 will. There were no declarations of the continued existence of the 1933 will to rebut the presumption of revocation, but there were declarations in aid of it. Wherefore, we conclude that this case is readily distinguishable on the facts from *Bowery* v. *Webber, supra.*

We emphasize that the evidence clearly shows that Col. Tate declared his intention to change the 1933 will. He stated to Mr. Buck and Mrs. Jones that he had written a will in his own handwriting. This, of course, could not have referred to the 1933 will which was not written in his own handwriting. As a matter of fact, Louvenia Campbell testified that she actually saw the holographic will in 1941, and saw Col. Tate's signature thereto. She said she was familiar with his handwriting. Without contradiction, the evidence clearly shows that Col. Tate made inquiry of his attorney, Mr. Dickinson, as to the course of descent and distribution under the statute in the event a man died without a will. It was shown that Col. Tate in 1941 was concerned over the fact that Mrs. Tate would not secure sufficient income from the estate, and he considered making her an outright guaranteed income of $1,000 per month, even if a portion of it had to be paid from the corpus of the estate. And finally, while in Savannah, Georgia, in December, 1941, he partly completed another holographic will in which he left his entire estate in fee simple to his wife. There can be no doubt that at the time these declarations were made Col. Tate had no reference to the 1933 will. Therefore, if he did make a holographic will in 1939 he would have had no reason to continue to keep the old will of 1933. Naturally he would have destroyed it.

If all of the evidence which was sought to be introduced and not admitted regarding the declarations made by Col. Tate while in Savannah to the effect that he had made his will and it was in his lock box in the bank at Marion had been admitted, it would not have rebutted the presumption that he had destroyed and revoked his 1933 will. At most those declarations would have tended to support the conclu-

sion that he had revoked the 1933 will by making a new holographic will in 1939, which latter will was in his lock box at the bank.

In Wills and Administration, Harrison, Vol. 1, p. 278, in speaking of the character of the evidence required to establish a lost will, it is said:

■ "In cases of lost or destroyed wills, the court requires the clearest evidence to establish the same. In such cases it is the sufficiency of the evidence which must be carefully weighed. A court of equity will not establish a lost muniment of title without the clearest and most satisfactory testimony. And as the character of the paper increases in importance, the stricter becomes the rule of law in requiring the evidence to be sufficient. Of course, the same rule applies in probate courts."

Many cases are cited to support the text.

If the declarations of Col. Tate to Mr. Buck and others were true, then he made a new will in his own handwriting. In this later will, according to his declarations, he changed his executor by adding a new co-executor. If he followed the form given him by Mr. Dickinson he eliminated a beneficiary to whom he had made a substantial bequest and who had been included in the 1933 will, and he declared that the life of the trust had been reduced from twenty-one years after the death of his widow to five years. There can be little or no doubt that Col. Tate made a holographic will in 1939 or some time later, for Louvenia Campbell saw it. The declarations of Col. Tate strongly corroborate her testimony, but the proof of the contents of that will is not of the character required to establish a lost will. Of course, the same presumption may be indulged that he destroyed and revoked the 1939 will when it was not found at his death, yet his declarations strongly tend to rebut the presumption.

■ ■ The form of will prepared by Mr. Dickinson in 1939 is not a copy of the holographic will. Of course a copy of a will is admissible in evidence in a suit to establish a lost will, but the form or guide introduced in this suit under the circumstances is not entitled to the

weight to which a copy would have been. Here Col. Tate did not say that he would write his holographic will in the identical language of the form given him. On the other hand, he said, "When I get it to suit me I will write it out in my own handwriting." This statement carries the implication that the form likely would be changed when he wrote his will. Moreover, no one ever saw the form again and no one has testified that it was followed. He may or may not have departed from it. No one was in position to identify it or to say that the will was copied from it. Therefore, it is of little or no weight in proving the contents of the 1939 will. The copy of the form introduced would not be a certain and reliable guide by which the court could definitely establish the contents. Certainly the court must know to whom and in what proportions an estate is given before it can establish a will. There can be no guess work. If the copy of the form were established as a will the court would be compelled to guess that Col. Tate followed the form. No one knows whether he did or not, and there is no evidence which tells us.

The only evidence of the contents of the 1939 will comes from the declarations of Col. Tate. These alone are not sufficient proof of contents. They may corroborate other evidence. Wills and Administration, Harrison, Vol. 1, p. 278. It is true Louvenia Campbell testified that she saw the will but her testimony is not sufficient to prove its contents.

The jury, by its verdict, and the court, by its decree, have in effect pronounced that the failure to find the will of 1939 was not the result of fraud. All we know is that the will was not found.

Therefore, as to the 1939 will, we have proof of its execution, and if the declarations made by the testator in Savannah just·prior to his death are admitted, we have proof of its continued existence, but we have insufficient proof of its contents. Under these conditions the court properly refused to establish it. Not having sufficient proof of the contents we are unable to compare it with the provisions of the 1933

will. We are left in the dark as to whether the provisions were the same or whether they were entirely different.

The trial court, in its opinion, thought it would have been unjust and unnatural for Col. Tate to have revoked his 1933 will. It had this to say:

"No just reason has been shown why Col. Tate would have revoked this will, even if any act looking to revocation had been shown.

"It would have been unnatural—it seems to me almost inhuman—for Col. Tate to have died without even mentioning the children of his deceased sister, Mrs. Rosa Tate Wren, towards which children, with rare exceptions, he always evinced real affection and towards whom, after their mother's death, he stood very much in *loco parentis*.

"The proposed draft of the 1939 will indicates that he thought of excluding Beverly Wren from participation in his estate. On reflection he may have thought that would be a little thing for a big hearted man to do. At any rate he didn't do it and the evidence is silent as to any reason whatever why he should have.

"Nor is any reason whatever given for excluding J. D. Mahoney, the boy whom Col. Tate had reared and in whom he always manifested a deep interest. It seems to me it would have been a strange and unnatural—almost a cruel—thing to do for Col. Tate to have died without even making mention of this good friend."

Ordinarily a man wants his property to go to his blood relatives rather than to the blood relatives of his widow, where there are no children. However, if he desires to divert his property in the course of its devolution to those not of his blood, he has the right to do so, and if this be his intent it may be accomplished in some cases by intestacy, and in others by will, depending upon the circumstances.

It could be plausibly argued that Col. Tate considered the effect of intestacy by his action in getting the information about it from his attorney some time after the alleged holographic will. It could likewise be argued that he wanted his wife to have his estate in fee as indicated by

writing the incompleted will in Savannah. In either event, with the exception of the realty, in case of intestacy, his estate would have been diverted from those of his blood. Therefore, it is not what we may think is the accomplishment of justice in the disposition of an estate, for a man may make an unjust or unnatural disposition of his property if he wants to do so. The material consideration is what, if any, disposition did he make of his estate, or did he permit the law to take its course and thereby let his estate go by the statute or descents.

As to the 1933 will, we hold that the presumption of revocation obtains; that it was not overcome by evidence and that it should not have been established.

There are more than twenty assignments of cross-error. In the main they have been disposed of by what we have already said.

We are opinion that the decree is erroneous and should be reversed and the bills dismissed.

*Reversed and dismissed.*