## Richmond

ANNIE H. HARRIS, ET AL. v. EDGAR L. HARRIS, ETC., ET AL.

March 5, 1976.

Record No. 750239.

Present, I'Anson, C.J., Carrico, Harrison, Harman, Poff and Compton, JJ.

*J. Forester Taylor*, for appellants.

*Humes J. Franklin; Richard A. Scholes (Franklin & Franklin*, on brief), for appellees.

HARMAN, J., delivered the opinion of the court.

Wade Hampton Harris, a 95 year old resident of Augusta County, died on May 2, 1973, seized and possessed of real and personal property there. His heirs at law were two sons, seven daughters and one grandson, the only child of a deceased daughter. This suit was instituted in January, 1974, under Code § 64.1-88 by the proponents, the two sons and a daughter of Harris, against the opponents, his other heirs at law, to establish what the proponents alleged to be Harris' last will and testament. If this will is established the proponents will be the principal beneficiaries.

A trial by jury under Code § 64.1-83 was waived and the chancellor heard the evidence ore tenus. This is an appeal by the opponents from the chancellor's ruling probating a copy of the will as the last will and testament of Harris, the deceased.

In his letter opinion the chancellor did not discuss the law applicable to the case, nor did he make findings of fact. To have arrived at the conclusion which he reached, however, the chancellor must have found either:

(1) that the rebuttable presumption of revocation, which arises when a will in the testator's possession, or accessible to him, cannot be found after his death, had no application; or

(2) that the presumption of revocation did apply, but that this presumption was overcome by the evidence of the proponents.

The evidence conclusively establishes that Harris and his wife duly executed complementary wills in late March of 1957. The evidence likewise clearly establishes the contents of Harris' will. Margaret Harris Shuler, the only proponent who testified, said that the two executed wills were "kept together" by Harris, who placed them "in his drawer or in his closet" in the downstairs bedroom which he and his wife occupied at the Harris home.

Mrs. Harris died in 1963. Mrs. Shuler qualified as administratrix of her mother's estate, representing to the Clerk of the Circuit Court of Augusta County that Mrs. Harris died intestate. Mrs. Shuler testified

that her father retained possession of his will "until long after" it was executed. She said that she then took it from his closet, without her father's knowledge, and "put it away for safekeeping" between some articles of clothing in a chest of drawers in her bedroom. This bedroom was located on the second floor of the Harris home. Mrs. Shuler's testimony about when this incident occurred is quite vague and confused.

At one place in her testimony, upon being asked when she took the will, she stated ". . . I imagine it was five years or more before he [her father] died." At another point she testified that it "probably was five years or more" after execution of the will before she obtained possession of it. On cross-examination, in response to a question about when she took the will, she agreed that it was "nine or ten years" before her father entered a nursing home. The other evidence establishes that Harris entered the nursing home in October, 1970.

Mrs. Shuler further testified that she discovered the will was missing from her chest of drawers "a couple or more years" after she obtained possession of it. At another point she said she discovered that the will was missing "quite a few years before" October, 1970, when her father entered the nursing home. Mrs. Shuler was not asked, and her testimony does not disclose, whether she ever reported to her father or to anyone else, prior to her father's death, her discovery that the will was missing.

The evidence shows that Harris, Mrs. Shuler and one of Harris' sons, Clarence Harris, were the only persons who regularly resided at the Harris home after Mrs. Harris' death in 1963. Harris occupied the only bedroom on the first floor of the house, and Mrs. Shuler and Clarence Harris, another of the proponents, each had a bedroom on the second floor.

All of the testimony shows that Mr. Harris, although then 85 years of age, was physically strong and mentally alert prior to his wife's death in 1963. It is uncontroverted that Harris, while in declining health thereafter, was physically able to "walk good" until shortly before he became ill and entered a hospital in late August of 1970.

The evidence further shows that Harris began to fail mentally sometime after his wife's death. Mrs. Shuler testified that his mind began to fail him "a couple of years or more" before he entered the hospital in August, 1970. She described his condition as "an old mind . . . he would forget what you would tell him [and] he couldn't remember things as good," and that for "about five years" before her

father's death "[h]is bedroom was downstairs and he stayed downstairs."

Isabelle Harris Gibson, one of the opponents of the will, testified that prior to entering the nursing home her father was "very senile and his memory was bad and my sister [Mattie Harris Reid] and I would spend time, about every other day I would be there to watch him just like a baby . . . because he would run off."

■ The controlling legal principles which control here are well settled in Virginia. Where an executed will in the testator's custody cannot be found after his death there is a presumption that it was destroyed by the testator *animo revocandi*. This presumption, however, is only *prima facie* and may be rebutted, *Jackson* v. *Hewlett*, 114 Va. 573, 77 S.E. 518 (1913), but the burden is upon those who seek to establish such an instrument to assign and prove some other cause for its disappearance, *Tate* v. *Wrenn*, 185 Va. 773, 40 S. E. 2d 188 (1946), *Shacklett* v. *Roller*, 97 Va. 639, 34 S. E. 492 (1899), by clear and convincing evidence leading to the conclusion that the will was not revoked. *Sutherland* v. *Sutherland*, 192 Va. 764, 66 S.E. 2d 537 (1951). But when the due execution is established, and it is shown that the will was not thereafter in the possession of the testator or accessible to him, no presumption of revocation arises on failure to find it. The presumption then is that it was lost and the burden of showing revocation is on him who asserts it. *Ballard* v. *Cox*, 191 Va. 654, 62 S.E.2d 1 (1950).

■ The proponents of the will argue here, as they did below, that the presumption of revocation does not apply to the facts of this case. In their brief they concede that "[t]he real issue . . . is *accessibility*." Conceding that "[t]he will was taken out of the testator's possession by Mrs. Shuler and placed in her chest of drawers," they argue that the will was not accessible to Harris because "[t]here is no evidence that the testator knew the new location of the will or even that it had been moved."

The rule of access, or opportunity of repossession, is one of possibility, not probability, of such access by the testator. If the possibility of access is shown that is controlling. Where the custodian is the chief beneficiary of the will, the presumption of revocation is more forceful and, in those circumstances, more convincing proof to rebut it is required. *In re Calef's Will*, 156 A. 475 (N.J. Prerog. 1931).

We hold that the presumption of revocation applies here under the facts as shown by the record. From the time Harris' will was executed

until its disappearance, the will remained in the Harris home at all times. Clearly if the will had disappeared while it remained in the testator's "drawer or closet," before it was removed "for safekeeping" by Mrs. Shuler, the presumption would apply. We think it equally clear that access is established; the evidence that the testator continued to be physically active in and about his home until shortly before he entered the hospital in August, 1970, long after Mrs. Shuler discovered that the will was missing. The testimony of Mrs. Shuler that Harris' bedroom was downstairs and that her father "stayed downstairs" for "about five years" before his death is not sufficient to carry the heavy burden of proving nonaccess which falls upon her and the other proponents.

Since the presumption of revocation applies, the burden was upon the proponents to show, by clear and convincing evidence, some cause, other than revocation, for the disappearance of the will.

■ In their brief and at oral argument, the proponents suggest that we should infer that the will was not revoked because there is no evidence that the testator ever exercised control over the will after it was taken from his custody by Mrs. Shuler. They would also have us infer that the will was lost rather than revoked because of Mrs. Shuler's testimony of the will's location and that this location was unknown to the testator. They also say that we should infer that the will was not revoked because there was little, if any, evidence of a change in testamentary intent by the testator after the will was executed.

While these inferences could be drawn from the evidence, other equally probable inferences favorable to the opponents could be drawn from the same evidence. Thus, the proponents have failed to carry their burden of proving, by clear and convincing evidence, that the will was not revoked.

■ The proponents also argue that Mrs. Gibson's testimony that she, on infrequent occasions, went into Mrs. Shuler's bedroom, and evidence that other relatives were frequently in the home shows the probability of access by persons who would profit by destruction of the will. They say that we should infer from the evidence that the will was taken and detroyed by someone other than the testator. Although similar arguments were advanced in *Tate* v. *Wrenn, supra,* and *Sutherland* v. *Sutherland, supra,* we held in those cases, as we must hold here, that it is not sufficient to show that the will might have been destroyed or stolen without authority of the testator, but the evidence must show, with some clearness, the fact relied on; for a court of

equity does not set up lost papers except where it is clearly shown that it should be done and courts of probate are no less strict.

For these reasons, the decree of the trial court is reversed and a decree will be entered here refusing probate.

*Reversed and final decree.*