## Richmond

MARGARET CHERRICKS BROWN

V.

MARGARET GAULT HARDIN

June 17, 1983.

Record No. 810174.

Present: Cochran, Poff, Compton, Stephenson, Russell, and Thomas, JJ., and Harrison, Retired Justice.

*Daniel Hartnett (Ayres, Hartnett & Custis*, on briefs), for appellant.

*Jon C. Poulson (R. Norris Bloxom*, on brief), for appellee.

HARRISON, R.J., delivered the opinion of the Court.

Harry Bunting Cherricks, age 75, died in Chincoteague, Virginia, on January 10, 1979. During his lifetime he executed two wills, one dated March 26, 1957, in which he devised his estate to his sister, Margaret Cherricks Brown, and the other, dated No-

vember 14, 1978, in which he revoked the former will and devised his estate to a friend, Margaret Gault Hardin. The 1978 will was not found, and the earlier will was probated. Mrs. Hardin filed a suit to impeach the 1957 will and to establish the later will as the decedent's true last will and testament. A jury found in favor of Mrs. Hardin that the testator had not destroyed his 1978 will with the intention of revoking it. The trial court approved its verdict and ordered the 1978 will admitted to probate. Mrs. Brown has appealed.

The law controlling this decision is well settled and was recently summarized in *Harris v. Harris*, 216 Va. 716, 719, 222 S.E.2d 543, 545 (1976), as follows:

> Where an executed will in the testator's custody cannot be found after his death there is a presumption that it was destroyed by the testator *animo revocandi*. This presumption, however, is only *prima facie* and may be rebutted, *Jackson v. Hewlett*, 114 Va. 573, 77 S.E. 518 (1913), but the burden is upon those who seek to establish such an instrument to assign and prove some other cause for its disappearance, *Tate v. Wrenn*, 185 Va. 773, 40 S.E.2d 188 (1946), *Shacklett v. Roller*, 97 Va. 639, 34 S.E. 492 (1899), by clear and convincing evidence, leading to the conclusion that the will was not revoked. *Sutherland v. Sutherland*, 192 Va. 764, 66 S.E.2d 537 (1951). . . .

Mr. Cherricks, hereinafter referred to as Cherricks or decedent, a banker in Wilmington, Delaware, for thirty-five years, retired and returned to his family homeplace in Chincoteague, Virginia in 1958. His wife had died in 1956, and he had no children. There, the decedent met Margaret Gault Hardin and her husband, Roland Lee, at a restaurant they owned and operated at that time. The Hardins befriended the decedent, and a close and intimate friendship developed. It was characterized by the exchange of gifts and by numerous favors which the Hardins performed for Cherricks and which he, in turn, reciprocated. Mrs. Hardin frequently supplied meals for the decedent, either at her home or at his, sometimes did his shopping, occasionally washed his clothes, and often drove him places. Mr. Hardin performed odd carpentry jobs for Cherricks and was otherwise helpful and accommodating

to him. Cherricks was a frequent guest in the Hardin home, and he gave them vegetables from his garden.

In 1962, Cherricks' sister, Margaret Cherricks Brown, who was then a widow, also moved to Chincoteague. She had been living in Washington, D.C., where it appears that at one time she was living with Mrs. Woodrow Wilson as a companion and secretary. Mrs. Brown, a lady of substantial means, had previously built a home on the family property next door to her brother. She testified that she frequently gave him varying sums of money (approximately $40,000) to supplement his retirement pay, service pension, and earnings from his garden, fowls, and horses. A number of witnesses testified that Mrs. Brown had a drinking problem and that this was a source of some friction between the brother and sister. Mrs. Brown admitted that she drank and that her brother objected. She denied she was an alcoholic. Notwithstanding this, the relationship between the brother and sister was a close and affectionate one. The Hardins and Mrs. Brown were also friends and visited one another from time to time.

Mrs. Hardin testified that during the first week of November 1978, Cherricks told her that "he was going to will everything to me and he asked me to call Mr. Drummond Ayres [an Accomac attorney] and make an appointment." When asked if decedent gave any reason for changing the beneficiary of his estate from his sister to her, she answered, "He said she didn't need it and she drank too much."

Mr. Hardin testified that he was present when Cherricks told his wife that "he was going to leave everything to Margaret [Mrs. Hardin]. He said she had been good to him." Hardin also testified that at one time the decedent remarked to him that he thought about leaving his property to a cousin, Harry Clay Bunting, and that when Hardin observed that he thought the decedent would leave his property to his sister, Cherricks replied, "[N]o, she didn't need the money. He said she had plenty to do her as long as she lived and he said if he left it to her her niece would wind up with it and he didn't want her to have it."

B. Drummond Ayres testified that he represented Mrs. Brown but had not met her brother until November 14, 1978, when he came to his office with Mrs. Hardin and requested him to prepare a will. Ayres said that Cherricks was very brief and told him "I want to give everything to Mrs. Hardin and make her my executrix." The attorney did not question Cherricks but said he did look

at him quizzically because he knew that Cherricks and his sister had a very close relationship. Ayres further testified that the only statement volunteered by the decedent, following his quizzical look, was "She's been nice to me and I want to give her everything." He said that Mrs. Hardin took no part in the discussion, did not say anything, and made no effort to influence the decedent. Ayres did not remember whether Cherricks had the old 1957 will with him at the time. He did say that Cherricks was completely competent and lucid. The 1978 will was prepared, executed by Cherricks, and witnessed by Ayres and his secretary.

Mrs. Hardin testified that Cherricks had the 1957 will with him when he was in the attorney's office and that he left that office with both wills "in a white-looking folder or envelope or something. Mr. Ayres gave it to him." She said that she heard Cherricks say that he had to tear the old will up. They returned to Chincoteague, and Mrs. Hardin said the next time she saw the wills was the last of November, 1978 in Cherricks home. At that time Cherricks was going through some of his papers, looking for an insurance policy, and she noticed the two wills among his papers.

Mrs. Katherine Zagri, who lives in Silver Springs, Maryland, owns property in Chincoteague and has been visiting there since 1964. She testified that she knew of the close friendship that existed between Cherricks and the Hardins. She said that decedent was a part of the Hardin family. She knew of Cherricks' frustration over his sister's drinking habits and said that "he was concerned about her drinking. He was afraid she would hurt herself." She related a conversation that she had with Cherricks the last of November, 1978. On that occasion she said that Cherricks was very sentimental, showed her pictures of his wife taken when he was in the service, and frequently referred to Margaret Hardin as "daughter," and said "with tears in his eyes, 'I'm going to see to it that this girl is taken care of when I die. . . . She's done more for me than my own family.'" Mrs. Zagri described Cherricks as "a very private . . . person," intense and the type "if he said he was going to do something he would do it. He had very definite ideas about his life and the way he lived it."

In 1973 Cherricks opened a savings account in the Farmers and Merchants Bank at Oak Hall, payable to Mrs. Brown as survivor. On December 4, 1978, Cherricks closed out the account and opened another account in his name alone. The bank's teller said

he gave no reason for making the change and that they had no discussion about the transaction. The account showed a balance at that time of $18,467.56. Mrs. Hardin testified that on that day she was in Fayetteville, North Carolina and knew nothing about the transaction.

Mrs. Virginia Lassiter is a neighbor of Mrs. Hardin's daughter, Carolee H. Wheeler. She testified that she had gotten to know the Hardins and Cherricks through the Wheelers, and she recalled that Cherricks was visiting in the Wheeler home in Virginia Beach during the Christmas holidays 1978, when she had a conversation with him. She knew that the decedent considered himself one of the Hardin family and that the Hardins treated him as such. He expressed his appreciation of Mrs. Hardin's friendship with his sister and mentioned the fact that the sister "had a drinking problem that he couldn't tolerate." Mrs. Lassiter said that Cherricks was particularly touched by the fact that notwithstanding Mrs. Hardin's brother and Mrs. Wheeler's husband had died within a few days prior to Christmas, they thought enough of him to invite him at that time to spend Christmas with the family and that he had had a wonderful holiday with them. She said he expressed concern about Mrs. Wheeler and her four children and whether they would be financially secure. She testified that during their conversation the decedent said: " 'Well, in my way, I hope that some day I will be able to help them,' and he said Margaret and Roland had done so much for other people that he had recently, I believe he said the month before, changed his will and he said, 'It's impossible for me to repay them. They wouldn't take it if I offered it to them,' but he said, 'In my appreciation, what I have will be Margaret and Roland Hardin's and in that way they can in turn help their daughter.' " Mrs. Lassiter said that when she inquired if what he intended to do would not "present a problem," Cherricks replied, "No," that he had "a sister in a nursing home in Seaford, Delaware" and another sister (Mrs. Brown) "who lives here on the Island [Chincoteague] who has all that she needs." She said he added that "his sister, Margaret, because of her drinking habit, that anything he would leave her would just add to the problem; that she had all she needed to drink." Regarding his nieces and nephews, she said he observed: " 'They have never done anything for me' and that the only time he ever saw them was with outstretched hands when they came like a pack of vultures."

Mrs. Hardin remained with her daughter in Virginia Beach after the 1978 Christmas holidays. Cherricks returned to Chincoteague on December 26 or 27, and apparently was followed shortly thereafter by Mr. Hardin. On January 2, 1979, Cherricks wrote a letter to Carolee Wheeler, which reads as follows:

Dear Mrs. Wheeler
It was so nice of you to have me spend the Christmas Holiday in your lovely home. I enjoyed every minute with your nice family.
Thank you very much for all my gifts, also the ride to Billy Rose.
Wishing you all a Happy New Year

Love
Chick

P. S.   Come to see me when you come to Chincoteague. Regards to Margaret.

On the morning of January 9, 1979, Mrs. Hardin called Cherricks from Virginia Beach and had a short telephone conversation with him. She said that Cherricks asked about her daughter and the children, and if Carolee's husband had left her well off or had taken care of her, to which she replied yes. She said that during their conversation, Cherricks said "when I come home he was going to show me where he put the will." She said she did not know why he made the statement, but she responded, " 'I will be there Saturday or Sunday.' " She said he replied, " 'Okay, daughter, I will see you then.' "

Cherricks was found dead in his home about 11 p.m. on Wednesday, January 10, 1979. Roland Hardin had seen the decedent about 1 p. m. on that day. He said that Cherricks had called him early in the morning and told him that he was going to Pocomoke and wanted to know "if there was anything he could bring me back." When Hardin learned of Cherricks' death, he telephoned his wife to relay the news to her.

On Thursday morning, January 11, Mr. Hardin saw Mrs. Brown. He testified that at that time "I didn't say very much, but I did ask her if she knew that Chick had made a new will leaving everything to my wife, and her reply was, no, she didn't. She knew nothing about it." During that visit Hardin went with Evelyn

Drummond, Mrs. Brown's and Cherricks' part-time maid, to Cherricks' house to retrieve a Siamese cat that the Hardins had loaned decedent. Hardin testified that, in walking through the living room, he noted that everything therein "looked perfectly normal."

Evelyn Drummond testified that at the request of Mrs. Brown, she went into Cherricks' home on the morning of January 11 with Mr. Hardin to get the clothes in which to bury decedent. She said nothing was removed from the house by them other than the cat pan, "eleven cans of beer he took out and a little bit of vodka and whiskey in a bottle." Drummond also testified that later on January 11 she went back to Cherricks' house with the undertaker to get the clothes that she had left downstairs. When asked if she noticed any papers when she went in the house on Thursday morning with Mr. Hardin, and if anything was on the table, Drummond replied: "It was — like usually he had papers on there — stack of papers, I guess, about like that [indicating]." She said the papers that she saw Thursday were not present on the previous Monday when she cleaned. She said at that time "He had his checkbook and another little book and about two letters on the table because I cleaned the table." When she returned with the undertaker she said "the papers was on the table."

Drummond further testified that on the following day, Friday, January 12, she again went in the Cherricks home at 10 a.m. at Mrs. Brown's request, but this time she went with Mrs. Suzanne Baker, Mrs. Brown's niece. She said the papers were still on the table at that time but that Mrs. Baker "took the papers and put them in a bag. . . ." When asked how high was the pile of papers, she indicated a distance which the trial judge estimated to be four or five inches. She said that when they returned to Mrs. Brown's home, Mrs. Baker had the paper bag with her and "[s]he gave it to Mrs. Brown." She heard no conversation between the two ladies about the bag or its contents and did not know where they put the bag. She worked for Mrs. Brown the following Friday but never saw the bag again.

Mrs. Brown notified Mrs. Baker of Cherricks' death the night it occurred. She came to Chincoteague the following day and remained with her aunt for ten days. She testified that on Friday morning she and Drummond went into the Cherricks home to clean out the refrigerator and cut back the heaters. She said "Mrs. Brown asked me to pick up the papers . . . [i]f there were

any unpaid bills, she would attend to them." She said that she saw papers on the kitchen table and that she gathered them up and "put the papers in a brown paper bag and took them up to Mrs. Brown." She said that she and Mrs. Brown did not look at the papers until the following Tuesday. Baker went back in the Cherricks home on Friday afternoon with Mr. and Mrs. Hardin because Mrs. Hardin said "she wanted to look for a will." Baker overheard the conversation between Mrs. Brown and Mrs. Hardin in which Mrs. Hardin said there was a will leaving everything to her. Mrs. Baker said Mrs. Brown told her [Baker] "to go back [to the Cherricks home] with them [Mr. and Mrs. Hardin] and let them look, which she did." She said that when they got to the Cherricks home, they just walked in and stayed a couple of minutes and that Mrs. Hardin said "she thought that I had ransacked the place." She said Mrs. Hardin was very angry and turned and left.

Mrs. Hardin returned to Chincoteague from Virginia Beach on Friday morning, January 12. En route home she stopped by Ayres' office. She said that although her husband had told Mrs. Brown about Cherricks' new will, "I was afraid she might not believe us so I stopped by to ask Mr. Ayres to call her." She said that Ayres agreed to call Mrs. Brown, and she left his office. When she got to Chincoteague, she again phoned Ayres and he said to her "get yourself down there. I told her [Mrs. Brown] to go over to the house with you."

Ayres said that when Mrs. Hardin came to his office about 11 or 12 o'clock on January 12, he terminated a telephone conversation he was then having with Mrs. Brown. He said that Mrs. Brown had received a call from the undertaker with whom she had made her brother's funeral arrangements, and that the undertaker had been called by Mrs. Hardin and told that she was supposed to make the arrangements. Ayres said Mrs. Hardin "came there about the will" and that she thought she knew where it was in Cherricks' house. It was then that Ayres suggested that Mrs. Brown and Mrs. Hardin meet at 2 p.m. and go over to the Cherricks house together to find the will. It was during a second and later phone call with Mrs. Brown that Ayres told her about the new will he had drawn for Cherricks on November 14, 1978, in favor of Mrs. Hardin. The attorney could not recall whether Mrs. Brown mentioned to him that she had already found out about the new will. However, Ayres testified that she was aware that her

brother had made another will. He further said that he did not remember whether Mrs. Brown said anything to him at the time "about the fact that her brother had told her that he had destroyed this new will. . . . She told me that at a later time." He said Mrs. Brown told him "she was aware of the will, but he [her brother] did not tell her what the contents of it were, and she didn't ask him."

During the afternoon of January 12, a strained and unpleasant confrontation took place in Mrs. Brown's home between Mrs. Brown, the Hardins, and Mrs. Baker. Mrs. Hardin went to the Brown home as she had been directed to do by Ayres. First she asked Mrs. Brown if Ayres had called. Mrs. Brown responded that he had and that " 'Suzanne [Mrs. Baker] will go with you to look for the will.' " Mrs. Hardin testified that Mrs. Brown then said " 'Chick [her brother] tore it up.' " Responding to that statement, Mrs. Hardin said "I told her she was lying." Mrs. Hardin testified that she, her husband, and Mrs. Baker "went over to the house [Cherricks'] and when we got in, everything was gone so we just turned around and come back out."

It was the responsibility of the jury to determine the credibility of the witnesses and to weigh their testimony. Mrs. Brown was the party who would be most benefitted by the destruction of the decedent's 1978 will. The jury may have concluded, either that the decedent never told Mrs. Brown that he destroyed the 1978 will, or that, although he may have made that statement to his sister, he did not in fact destroy the will.

If the jury accepted Mrs. Hardin's testimony of the conversation she had with Cherricks on the morning of January 9, and it had the right to do so, it could have concluded that the 1978 will was in existence and in Cherricks' possession at that time and that it was decedent's intention to disclose its whereabouts to Mrs. Hardin immediately after she returned to Chincoteague from Virginia Beach. The question that logically follows is whether anything happened during the twenty-four hour period prior to Cherricks' death to cause him to change his mind. If so, the record before us fails to show it. He spent Wednesday, January 10 in an uneventful manner. He went about his usual business. He went shopping in Pocomoke, drove a motor vehicle there, ran an errand for Mr. Hardin, and went home. Nothing he did indicated that he felt his death was imminent.

The individuals involved in this case are competent, intelligent, and responsible people. The testimony shows Mrs. Brown to be an interesting and generous person who is also wealthy. The decedent was by no means impoverished. He owned his home and other land, received retirement benefits and a government pension, sold vegetables and fowls, and had a generous sister. He was portrayed as a positive individual, one who made up his own mind and formed his own judgments. The Hardins, although not wealthy, can be described as "moderately well-off." They had recently sold a business for $80,000 and owned a number of income-producing cottages in Chincoteague.

Unlike so many will controversies, the competency of the testator here is not in question. And neither is there any evidence of any undue influence that the Hardins exercised, or attempted to exercise, to get the decedent to devise his property to Mrs. Hardin. Competent and disinterested witnesses testified to the close friendship that developed between the decedent and the Hardins, and there is no suggestion by them that their relationship was anything other than that of friends and neighbors.

The act of the decedent making Mrs. Hardin the beneficiary of his estate was not an unnatural act on his part. She was his friend and benefactor, and obviously he came to regard her as a daughter. His wife was dead, he had no children, and he was described by a witness as "lonely." During the last ten years of his life the Hardins supplied his friendship and companionship needs. While his relationship with his sister was close, she was wealthy, and he did not feel that she needed his money. He also felt that it might augment her drinking problem, to which he had an aversion. Cherricks was not close to his nieces and nephews, and apparently never gave serious thought to devising his estate to them or to the sister who was in a retirement home.

In support of her argument that her brother destroyed the will he made in 1978, appellant points to her testimony that about the first of December of that year he said to her, " 'I changed my will, but I have torn it up.' " She admits that Cherricks at one time intended to tear up his 1957 will but argues "the stark fact" is that he never did, although he knew that by tearing up a will he would revoke it.

Mrs. Brown was the only witness who questioned the sincerity of the friendship that existed between the decedent and Mrs. Hardin. She said her brother was displeased because Mrs. Hardin had

remained in Virginia Beach instead of coming home with her husband, and on one occasion, when asked when she was coming home, exclaimed, " 'I don't know and I don't give a damn.' " It appears out of character that Mrs. Hardin's stay in Virginia Beach to assist her daughter in adjusting to her husband's recent death would have provoked such a strong and insensitive statement by the decedent. Further, Mrs. Brown's testimony that the decedent had become disenchanted with Mrs. Hardin, and did not want to visit with her family over the Christmas holidays is negated by the warm letter which the decedent wrote Mrs. Wheeler only a few days prior to his death, to which he added a postscript, "Regards to Margaret [Mrs. Hardin]."

Appellant's reliance upon *Harris* v. *Harris, supra,* is misplaced. There, the testator and his wife executed complementary wills in 1957. The wills were kept together by Harris in a drawer or closet in a downstairs bedroom which he and his wife occupied in their home. The wife died in 1963, and her daughter qualified as her administratrix, representing that her mother died intestate. Harris died in 1973. The 1957 will could not be found, and a suit was instituted by two sons and the same daughter to establish the lost will. It developed that the daughter had removed it from the closet where it had been placed by her father and, without his knowledge, she put it away for safekeeping between articles of clothing in a chest of drawers in her bedroom on the second floor of the home. Testimony was introduced regarding the physical condition of Harris during the latter years of his life, his access to the will, and the opportunity he had to destroy it. We found that the presumption of revocation had not been overcome. The mere fact that a proponent of the will testified that he stayed in his downstairs bedroom for about five years before his death was not sufficient to carry the heavy burden of no access to the will by decedent. Significantly, in *Harris,* the daughter who removed the will from her father's downstairs bedroom to her own bedroom was one of the three persons who had the greatest interest in preserving the will and preventing its destruction by the father. She offered no satisfactory explanation of its disappearance from her bedroom and possession to counter the presumption that in some way her father had obtained the document and destroyed it.

Counsel for Mrs. Brown concedes, as he must, that the 1978 will was executed by Cherricks with Mrs. Hardin as the beneficiary therein. And appellant also admits that there can be no

question on this appeal that statements were made by Cherricks before the execution of the new will, after its execution, and shortly before his death of his intention to take care of Mrs. Hardin.

In *Shacklett* v. *Roller*, 97 Va. 639, 644, 34 S.E. 492, 494 (1899), it was said:

> The declarations of a testator, after he has made his will, as to its continued existence, its contents, or its revocation, where the will cannot be found after his death, is recognized under certain circumstances as entitled to great weight, not only by judges who think such evidence admissible, but also by those who reject it. . . .

The statement to Mrs. Brown by the testator that he had made a new will but destroyed it was allegedly made about the first of December, 1978. Two disinterested witnesses, Mrs. Zagri and Mrs. Lassiter, and Mr. and Mrs. Hardin, interested parties, testified that the decedent had referred to the existence of the 1978 will in statements made to them about, and subsequent to, the time that he is supposed to have told his sister that he destroyed the will.

Perhaps the most significant occurrence in this case was the removal of all of decedent's papers from his home within less than thirty-six hours after his death. Mrs. Baker says these papers were removed by her at the request of her aunt. They therefore came into the possession of the one person who would be most adversely affected by the continued existence of the 1978 will.

We observe here that Cherricks did not cloak his actions in secrecy. At least five people knew of the existence of the 1978 will on the day it was executed. The decedent soon thereafter told others about the disposition he was making of his property. Mr. Hardin says he advised Mrs. Brown on the Thursday following decedent's death that her brother had made a new will naming his wife as beneficiary. Mrs. Brown obviously knew about the possible existence of this will and of the controversy that was developing on Friday morning when she dispatched Baker to gather up the decedent's papers. Notwithstanding this knowledge, and the fact that the controversy could most likely be settled by an examination of Cherricks' papers, both Mrs. Brown and Mrs. Baker testified that they did not look at the papers, or examine the contents

of the bag containing them, until the following Tuesday, six days after the decedent's death and four days after these papers, and possibly the will in controversy, had come into their possession.

The jury may have found in this case that the testimony of Mrs. Brown and Mrs. Baker that they did not examine the decedent's papers which were in their exclusive possession until the following Tuesday was unrealistic, unnatural, contrary to all human experience, and unbelievable. It would appear reasonable to believe that self-interest, or normal curiosity, would have compelled a look by these two interested parties to find out if their brother and uncle had really torn up a will he had recently made, as Mrs. Brown claimed he told her he was going to do.

The jury may have found it inexplicable that when her attorney suggested that Mrs. Brown and the Hardins go to the Cherricks home and make an effort to locate the 1978 will, Mrs. Brown did not then tell Ayres that her brother had told her that he had made that will but had destroyed it. Ayres testified that she made no such statement to him at that time. Neither did Mrs. Brown tell her attorney that she had taken control and possession of decedent's papers nor ever explain why she sent her niece with the Hardins to look for a will among papers in the Cherricks home, which papers were then in a closet in her own home.

The jury was fully and correctly instructed. Among other things it was told that there is a strong legal presumption that Cherricks destroyed the will with the intention of revoking it; that to overcome this presumption the burden was upon Mrs. Hardin to prove by clear and convincing evidence that the will was not destroyed by Cherricks but was destroyed or secreted by some other person with intent to prevent its probate or recordation, or was lost or misplaced; that it was not incumbent upon Mrs. Hardin to prove that the 1978 will was destroyed or suppressed by any certain person nor specifically what became of said will; and that she only had to prove by clear and convincing evidence that Cherricks did not destroy the will with the intention of revoking it.

In *Walker Agcy. & Aetna Cas. Co.* v. *Lucas,* 215 Va. 535, 540-41, 211 S.E.2d 88, 92 (1975), we approved the following definition of clear and convincing evidence found in *Cross* v. *Ledford,* 161 Ohio St. 469, 477, 120 N.E.2d 118, 123 (1954):

"[T]hat measure or degree of proof which will produce in the mind of the trier of facts a firm belief or conviction as to the

allegations sought to be established. It is intermediate, being more than a mere preponderance, but not to the extent of such certainty as is required beyond a reasonable doubt as in criminal cases. It does not mean clear and *unequivocal.* . . .

In *Bradley v. Commonwealth*, 196 Va. 1126, 1136, 86 S.E.2d 828, 834 (1955), we said:

In testing the credibility and weight to be ascribed to the evidence, we must give trial courts and juries the wide discretion to which a living record, as distinguished from a printed record, logically entitles them. The living record contains many guideposts to the truth which are not in the printed record; not having seen them ourselves, we should give great weight to the conclusions of those who have seen and heard them.

The case under review is peculiarly one for the trier of the facts. A jury had determined, from evidence it found clear and convincing, that a will which Harry Bunting Cherricks executed on November 14, 1978, was not destroyed by the testator with the intention to revoke it, and the trial judge has approved its finding. We cannot say that the judgment is clearly wrong and, accordingly, we will affirm.

*Affirmed.*