PRESENT: All the Justices

JAMES CHRISTOPHER EDMONDS
                                             OPINION BY
v.  Record No. 141159          CHIEF JUSTICE DONALD W. LEMONS
                                             June 4, 2015
ELIZABETH CASHMAN EDMONDS, ET AL.


               FROM THE CIRCUIT COURT OF ARLINGTON COUNTY
                     William T. Newman, Jr., Judge

     In this appeal, we consider whether the trial court erred

when it ordered a photocopy of a will to be probated.  We must

determine whether the trial court applied the correct legal

standard in reaching its decision, and whether the evidence was

sufficient to support the trial court's determination.

                     I.  Facts and Proceedings

     James A. Edmonds, Jr. ("Edmonds") died on April 30, 2013.

Edmonds was survived by his wife, Elizabeth Cashman Edmonds

("Elizabeth"), his daughter from that marriage, Kelly Elizabeth

Edmonds ("Kelly"), and a son from a previous marriage, James

Christopher Edmonds ("Christopher").

     It is undisputed that on November 8, 2002, Edmonds

executed a will ("2002 Will") which left all of his personal

property to his wife, Elizabeth, and the remainder of his

property to a revocable living trust ("Trust").  The 2002 Will

stated that in the event Elizabeth pre-deceased Edmonds all of

Edmonds' personal property would go to his daughter Kelly.  The

2002 Will intentionally omitted Christopher as a beneficiary.

The documents creating the Trust were also executed on November 8, 2002. Elizabeth and Kelly are the beneficiaries of the Trust. The Trust documents state that Christopher was intentionally omitted as a beneficiary.

At the same time Edmonds executed his 2002 Will and Trust documents, Elizabeth also executed her will and trust documents. Her estate planning documents were a mirror image of Edmonds' documents, leaving all of her estate to Edmonds, and if Edmonds predeceased her, leaving everything to Kelly.

After Edmonds died, his original 2002 Will could not be located. However, photocopies of the 2002 Will and Trust documents were found in a green binder in Edmonds' filing cabinet in his office. Thereafter, Elizabeth filed a "Complaint to Establish Copies of the Will and Trust Where Originals Cannot Be Located," in the Circuit Court of Arlington County ("trial court") and named Kelly and Christopher as defendants. The complaint acknowledged that Kelly and Christopher would both be heirs at law if Edmonds was deemed to have died intestate, but asked the trial court to establish and direct probate of the photocopy of the 2002 Will and the Trust.

Christopher filed an answer, counterclaim, and cross-claim. He sought to establish that Edmonds died intestate, and that Christopher was an heir at law. Christopher asserted that because the 2002 Will was in Edmonds' possession when he died,

2

and Elizabeth had been unable to locate it, the presumption that Edmonds had destroyed it with the intent to revoke it applied.

Kelly filed answers to the complaint and the cross-claim. She admitted that she would be an heir at law if Edmonds died intestate, but she asked the trial court to find that the 2002 Will was valid and to probate the photocopy. She asserted there was no evidence that Edmonds destroyed the 2002 Will with the intent to revoke it.

A two-day trial was held on March 25-26, 2014. Elizabeth presented numerous witnesses who described conversations they had with Edmonds regarding his testamentary intentions. Patrick J. Vaughn, an attorney who prepared wills and trust documents for Edmonds and Elizabeth in 1973, and again in 1989, testified that in the 1973 will, Edmonds left his estate to Elizabeth, and expressly excluded any child of his born from a previous marriage. In the 1989 will, Edmonds again left everything to Elizabeth. In the event Elizabeth predeceased him, he left everything to his daughter, Kelly.

Marc E. Bettius ("Bettius") testified that he had been friends with Edmonds and Elizabeth for more than 30 years. Bettius stated that in the fall of 2012, he had gone by Edmonds' auto business to have his car serviced, and he and Edmonds had a conversation. During that conversation, Bettius

3

asked Edmonds what plans he had made for the future of his business, and Edmonds indicated that everything was taken care of in his estate and it would all go to Elizabeth. Edmonds also stated that he made the appropriate decisions to maximize estate tax benefits. Bettius knew Edmonds had a son from a previous marriage and asked Edmonds if he'd ever thought about having a relationship with his son. Edmonds responded in the negative and said that, "the boy had never been a part of his life and never would be a part of his life."

Paul C. Kincheloe ("Kincheloe"), an attorney who had been friends with Edmonds since the 1970s, testified that he was not professionally engaged to do any estate planning for Edmonds, but they did discuss the subject on several occasions. At one point, Edmonds asked Kincheloe to serve as substitute trustee, and Kincheloe agreed. Edmonds told Kincheloe he was leaving everything to his wife and daughter, and nothing to his son.

John A. Bell, Jr. ("Bell") testified that he had been friends with Edmonds and Elizabeth since the 1980s. The last time he was with Edmonds was during the first week of March 2013, when Edmonds invited him to Florida for a four-day golf tournament. Bell testified that he brought up the subject of estate planning because he was deciding what do with his own estate. During that conversation, Edmonds said, "As soon as I go, everything goes to Liz. And as soon as she goes,

4

everything goes to Kelly." When asked if Edmonds ever said anything negative about Christopher, Bell responded that Edmonds had never mentioned his son. Bell testified that about three or four years before this March 2013 conversation, he and Edmonds had another discussion about their estates. During that discussion, Edmonds said he was trying to set up his estate so that Kelly would receive her inheritance in increments. Bell testified that Edmonds was concerned that Kelly would spend the money all at once. Edmonds was also concerned that he had paid for Kelly to have a great education, and he was not sure she was using it wisely.

Raymond Knight, one of Edmonds' employees in his auto business, testified that approximately six years before Edmonds died, they had a conversation about the future of the business if anything happened to Edmonds. Edmonds told him that "Liz would carry on the business."

Donald Manning ("Manning") was the attorney who prepared the 2002 Will. Manning testified that when he met with Edmonds and Elizabeth to prepare their wills in 2002, Edmonds made it clear that he did not want Christopher to be a beneficiary. Manning testified that after Edmonds and Elizabeth executed their wills and trust documents, he made photocopies of the originals. Several weeks later, Edmonds picked up both the originals and the photocopies. Manning testified that the

5

photocopies were placed in a green binder before Edmonds picked them up. Manning also testified that Edmonds never completed several of the items related to the estate plan, such as funding a family trust or retitling stock, but Manning agreed that those items did not affect the 2002 Will.

Meta Jane Mortensen ("Mortensen"), who prepared Edmonds' taxes each year, testified that she had a discussion with Edmonds wherein she told him she was concerned about the tax implications of his estate plan and wanted to see the documents governing it. Edmonds finally brought her his estate documents in 2011. The documents Edmonds showed her in 2011 were the 2002 Will and Trust.

Dina Knight, the bookkeeper for Edmonds' auto business, testified that although Edmonds did not discuss his estate plan in specific terms with her, he told her that one day the business would belong to his wife and daughter. Knight also testified that Edmonds kept all of his important papers in the filing cabinet in his office. After Edmonds died, Knight looked through the cabinet for important papers Elizabeth would need, and that is where she found life insurance papers, lease agreements, and the green binder with the copies of the 2002 Will and Trust documents. Knight did not know the documents in the green binder were photocopies when she found them. Upon learning that those documents were not originals, Knight

assisted Elizabeth in looking through all the cabinets and drawers in the auto business, but they never found the original 2002 Will.

Elizabeth testified that she and Edmonds were married in 1972. She explained that Edmonds had three serious surgeries during their marriage, one in 1992, another in 1998, and the last one in 2003. Prior to each of these surgeries, he always told her that all the important papers she would need, including his will, were in the top drawer of his filing cabinet in his office. Elizabeth testified that when they prepared their wills in 2002, Edmonds was clear that he wanted to exclude Christopher as a beneficiary. Elizabeth also testified that in late March or early April of 2013, while they were still in Florida, Edmonds stated that when they got back to Virginia they should make an appointment with their estate attorney to starting putting into place several of the estate planning items, including funding the family trust and retitling some of their stock.

Christopher testified that he had never met or spoken to Edmonds, although he did make two attempts to contact him.

After hearing the evidence and considering the argument of counsel, the trial court stated that "in my mind it's a very close . . . case." The trial court held that the execution and content of the 2002 Will was not contested. The trial court

also held that the evidence proved that the documents were traceable to Edmond's possession but were not found at his death. The trial court stated that it had to determine whether the evidence was sufficient to overcome the presumption that the testator had destroyed the will with the intention to revoke it.

After a thorough review of the evidence in the case, the trial court held that the plaintiff had proven "by clear and convincing evidence" that the 2002 Will was not revoked. The trial court stated that it was relying on this Court's opinion in Bowery v. Webber, 181 Va. 34, 23 S.E.2d 766 (1943), which it found to be controlling. The trial court noted that here, as in Bowery, there was compelling evidence of the decedent's deep affection for the proponent of the will, and that the decedent had made a number of statements to various disinterested parties related to the disposition of his estate. The trial court further noted that it found those witnesses to be "highly credible." Finally, the trial court held that there was no evidence of any credible reason or cause for the decedent to have made any change in the testamentary disposition of his estate. The trial court ordered that the photocopy of Edmonds 2002 Will be probated.

The trial court entered a final order on May 9, 2014, and Christopher appealed to this Court. We granted Christopher's appeal on the following assignments of error:

1. The trial court erred when it ordered a photocopy of the will to be probated, because it applied the wrong legal standard in allowing a decedent's general statements of intent and affection to overcome the presumption of revocation of the missing original will, thus failing to follow this Court's numerous decisions requiring clear and convincing evidence of some other cause for the original will's disappearance.

2. The trial court erred when it ordered a photocopy of the will to be probated, because it allowed less than clear and convincing evidence to overcome the presumption of revocation, contrary to this Court's decisions.

## II.  Analysis

### A. Standard of Review

Whether the trial court applied the correct legal standard in this case is a question of law. We review questions of law de novo. See Lamar Co. v. City of Richmond, 287 Va. 322, 325, 757 S.E.2d 15, 16 (2014). The issue whether Elizabeth, the proponent of the will, proved by clear and convincing evidence that Edmonds did not revoke his will is a question of sufficiency of the evidence. A judgment should be reversed for insufficient evidence only if it is "plainly wrong or without evidence to support it." Atrium Unit Owners Ass'n v. King, 266 Va. 288, 293, 585 S.E.2d 545, 548 (2003) (internal quotation marks omitted).

B. Virginia's Legal Standard for Missing Wills

Over the past century, this Court has decided numerous cases involving missing wills, and the law controlling this case is well-established. The most recent case this Court decided involving this issue was Brown v. Hardin, 225 Va. 624, 304 S.E.3d 291 (1983), where we stated:

> Where an executed will in the testator's custody cannot be found after his death there is a presumption that it was destroyed by the testator animo revocandi. This presumption, however, is only prima facie and may be rebutted, but the burden is upon those who seek to establish such an instrument to assign and prove some other cause for its disappearance, by clear and convincing evidence, leading to the conclusion that the will was not revoked.

Id. at 626, 304 S.E.2d at 292 (citations omitted).

Neither party in this appeal disagrees that, where an executed will in the testator's custody cannot be found after his death, there is a presumption that it was destroyed by the testator with the intent of revoking it. In this case, the 2002 Will was traced to Edmonds' custody, but could not be found at his death. Accordingly, the trial court properly applied the presumption in this case that the 2002 Will was destroyed by Edmonds.

The parties also do not appear to disagree that the presumption of revocation can be overcome by the proponent of the will upon presentation of clear and convincing evidence,

10

leading to the conclusion that the will was not revoked by the testator. Instead, the dispute in this case involves what the proponent of the will must prove to meet her burden of proof, and whether she met her burden of proof in this particular case.

Christopher argues that to meet her burden of proof, Elizabeth was required to prove "some other cause" for the disappearance of the will, and that evidence of general intent and affection alone is not clear and convincing evidence, sufficient to overcome the presumption of revocation. Christopher contends that the only case that supports Elizabeth's position, Bowery, is an "outlier" and should not have been relied on by the trial court.

A review of our decisions over the past century on the issue of missing wills is informative. In 1913, we provided a synthesis of the operation of the lost will presumption and the evidence sufficient to rebut it, in deciding the case of Jackson v. Hewlett, 114 Va. 573, 77 S.E. 518 (1913). In Jackson, the evidence proved that the decedent had made a will in which he devised the bulk of his estate to his illegitimate daughter, and left only a few minor devises to others, including his legitimate daughter. Id. at 575, 77 S.E. at 519. The will was kept in an unlocked drawer, but after decedent's death the will could not be located. Id. at 576, 77 S.E. at

11

519.  The proponent of the will introduced numerous declarations by the testator regarding his intentions to leave the bulk of his estate to her, and not to his other relatives. Id. at 576-77, 77 S.E. at 519.

We explained that these declarations were not introduced for the purpose of proving the will, its due execution, or its contents.  Rather,

> [t]hey were introduced as evidence showing a strong and unvarying adherence by the testator to his purposes with respect to the disposition of his estate, which had obtained for years prior to his death, both as to the beneficiaries thereunder and as to those omitted therefrom; and for the purpose of rebutting the presumption that this testator deliberately destroyed, with intent to revoke, a will he had so carefully prepared, and to which he had so firmly adhered.

Id. at 578, 77 S.E. at 520.

We held that, in a case like Jackson, the presumption could only be overcome by this type of evidence, since "[i]t is impossible for the beneficiaries under the will to say what became of it; they can only assert that, whatever may have happened to it, the testator did not revoke it."  Id. at 580, 77 S.E. at 521.  We concluded that:

> It must be generally the case, in such a status, that the best evidence, if not the only evidence, that can be adduced to rebut the presumption of revocation is that the testator's mind for many years contemplated a certain disposition of his property; that

12

> when he disposed of that property by will
> his mental attitude was precisely the same
> that it had been during the previous years,
> and that after he made such disposition his
> mind remained in the same state practically
> until his death, supplemented by the
> consistency of his mental attitude towards
> his various relatives.

Id. at 581, 77 S.E. at 521. Our decision in Jackson recognizes that it may very well be impossible for the proponent of a missing will to explain what happened to the will, and therefore the statements of the testator regarding his testamentary intentions may be the best evidence to rebut the presumption of revocation.

The next case we decided involving a missing will was Bowery, handed down in 1943 – the decision that appellant contends is an "outlier," but which in fact gave another concrete illustration of the nature of the evidence required to rebut the presumption of revocation for a lost will. In Bowery, the decedent had prepared a will which left her estate to her step-granddaughter, whom she had raised as her daughter, but excluded other relatives. 181 Va. at 35, 23 S.E.2d at 766. At the time of the testator's death, the will could not be found, and the proponent of the will filed a bill to establish the will, alleging that the will had become lost or misplaced, but that it had not been revoked. Id. The proponent of the will put on evidence that the decedent repeatedly stated to her

intimate associates that she desired and intended to leave all of her property to her adopted daughter. Id. at 37, 23 S.E.2d at 767. In contrast, there was no evidence of any such affection or intention toward her other relatives. Id. There was also no evidence of any incidents occurring which would have induced the decedent to revoke or change her will. Id. We held that this evidence was sufficient to support the conclusion that the testator did not destroy her will with the intent to revoke it. Id. at 39, 23 S.E.2d at 768.

Three years after Bowery, we decided Tate v. Wren, 185 Va. 773, 40 S.E.2d 188 (1946), holding that the evidence presented in that case was not sufficient to overcome the presumption of revocation. We explained that, unlike the record before the trial court in Bowery, there was no evidence in Tate of declarations by the testator that his 1933 will was still in effect. Id. at 785-86, 40 S.E.2d at 194. To the contrary, there was evidence that the testator had made numerous statements that he intended to change his 1933 will, and that he had actually prepared a new holographic will. Id. at 786, 40 S.E.2d at 194. It is important to note, however, that in distinguishing the facts in Tate from the facts in Bowery, we never indicated that Bowery was an "outlier" or no longer correct.

14

Later cases have confirmed the continued application of Jackson and Bowery in lost will cases. For example, in Sutherland v. Sutherland, 192 Va. 764, 66 S.E.2d 537 (1951), we referenced our decisions in Bowery and Jackson, and stated that, in our opinion, the facts in those two cases "were clear and convincing." Id. at 774, 66 S.E.2d at 543. We determined that the facts in Sutherland did not "measure up" to the facts present in Bowery and Jackson, and therefore we held that the proponent of the missing will had failed to meet his burden of proof to overcome the presumption of revocation. Id. at 774-75, 66 S.E.2d at 543-44. Our opinion in Sutherland makes clear that we viewed Jackson and Bowery to be correct, and to be examples of factual scenarios where the proponent of the missing will had met the necessary burden of proof to overcome the presumption of revocation.

Where the will-proponent's proof fails to clearly and convincingly rebut the presumption of revocation, the burden is not met and the will cannot be probated. In Harris v. Harris, 216 Va. 716, 222 S.E.2d 543 (1976), for example, the proponents of the missing will argued that the will was not actually in the decedent's possession at the time of his death, and for that reason the presumption of revocation should not apply. Id. at 719, 222 S.E.2d at 545. However, we disagreed and held that the evidence proved that the will remained in the

15

decedent's house, and therefore the presumption of revocation applied.  Id. at 719-20, 222 S.E.2d at 545.  Further, we determined that the proponents had not met their burden of overcoming the presumption, because the only evidence presented was that other relatives were frequently in the house and could have had access to the will.  Id. at 720, 222 S.E.2d at 546. We held that this evidence left the competing inferences "equally probable," and was not enough to constitute clear and convincing evidence that the will was not revoked by the testator.  Id.

The most recent decision by this Court on the issue of a missing will was the Brown case.  In Brown, there was no dispute that the decedent had made a will in which he left the majority of his estate to a family friend instead of his sister.  There was evidence presented that the decedent had told numerous witnesses that he intended to leave everything to the friend, and that he was not leaving anything to his sister because she was already well off and did not need the money. 225 Va. at 636-37, 304 S.E.2d at 298.  We emphasized that:

> The declarations of a testator, after he
> has made his will, as to its continued
> existence, its contents, or its revocation,
> where the will cannot be found after his
> death, [are] recognized under certain
> circumstances as entitled to great weight.

16

Id. at 636, 304 S.E.2d at 298 (quoting Shacklett v. Roller, 97 Va. 639, 644, 34 S.E. 492, 494 (1899)). Evidence was also presented that the sister had access to the decedent's personal papers within 36 hours of his death, which might have explained the disappearance of the will. Id. The Court stated that to overcome the presumption that the will was destroyed by the testator with the intention of revoking it,

> the burden was on [the proponent of the will] to prove by clear and convincing evidence that the will was not destroyed by [the testator] but was destroyed or secreted by some other person with intent to prevent its probate or recordation, or was lost or misplaced; that it was not incumbent upon [the proponent] to prove that the [will] was destroyed or suppressed by any certain person nor specifically what became of said will; and that [the proponent] only had to prove by clear and convincing evidence that [the testator] did not destroy the will with the intention of revoking it.

Id. at 637, 304 S.E.2d at 299 (emphasis added).

It is clear from a review of our extensive caselaw on this topic that a proponent of a missing will is not required to specifically prove what became of the missing will. The language cited above from Brown demonstrates that we rejected the appellant's interpretation of our cases that a proponent is required to prove what happened to the will. Instead, the proponent is required to prove, by clear and convincing

17

evidence, that the testator did not destroy the will with the intention of revoking it.

The evidence presented by a proponent of a missing instrument will take different forms depending on the facts and context of each individual case.  In some cases, the proponent may present evidence regarding what could have happened to the will; and in other cases, there may be no evidence to explain why the will is lost or missing.  The facts of each case are different, and the evidence in each case will therefore also be different.  What remains the same is that each proponent of a missing will must prove, by clear and convincing evidence, that the testator did not destroy the will with the intention of revoking it.  That is the standard that we have articulated in all our cases over the past century, and it remains the law of the Commonwealth today.

It is clear from the transcript of the trial and the final order that in the present case the trial court applied the proper legal standard.  The trial court recognized that, because the will was traced to Edmonds' possession but was not located at his death, the presumption of revocation applied. The trial court then stated that the presumption could be overcome by clear and convincing evidence that the will was not revoked by the defendant.  Accordingly, with respect to

18

assignment of error one, we hold that the trial court did not err, and that it applied the proper legal standard.

## C. Overcoming the Presumption of Revocation

In assignment of error two, Appellant asserts that the trial court erred because it allowed less than clear and convincing evidence to overcome the presumption of revocation. We have defined clear and convincing evidence as:

> [t]hat measure or degree of proof which will produce in the mind of the trier of fact a firm belief or conviction as to the allegations sought to be established. It is intermediate, being more than a mere preponderance, but not to the extent of such certainty as is required beyond a reasonable doubt as in criminal cases. It does not mean clear and unequivocal.

Brown, 225 Va. at 637, 304 S.E.2d at 299 (quoting Walker Agcy. & Aetna Cas. Co. v. Lucas, 215 Va. 535, 540-41, 211 S.E.2d 88, 92 (1975)).

The remaining question is whether the proof in this case was sufficient to produce in the mind of the trier of fact a firm belief or conviction that Edmonds did not destroy the original copy of the 2002 Will with the intention of revoking it. The trial court found that Elizabeth had proven that fact by clear and convincing evidence. Elizabeth is entitled to have this Court review the evidence and all reasonable inferences therefrom in the light most favorable to her, the prevailing party at trial. See Exxon Mobil Corp. v. Minton,

19

285 Va. 115, 121, 737 S.E.2d 16, 22 (2013). Viewing the evidence in the light most favorable to Elizabeth, the evidence is sufficient to support the trial court's finding that she had rebutted the presumption that the original 2002 Will was missing because Edmonds had purposefully destroyed it with the intention of revoking it, by offering clear and convincing evidence to the contrary.

Edmonds and Elizabeth had been married for more than 40 years and had complementary estate plans in place to provide for each other and then to pass their estate to their daughter Kelly after they both died. On numerous occasions, Edmonds stated his intent that his estate be handled in such a manner, declarations that are both admissible and entitled to great weight. See Brown, 225 Va. at 636, 304 S.E.2d at 298; Shacklett, 97 Va. at 644, 34 S.E. at 494.

Christopher testified that he had never spoken with or met Edmonds. Edmonds stated to his friend Bettius that he had no interest in having a relationship with Christopher. Edmonds had at least three wills, and each time he changed his will, he had a new one prepared. Christopher was never listed as a beneficiary in any of Edmonds' wills. During the preparation of his 2002 Will, Edmonds was clear that he did not want Christopher to be a beneficiary. Because Edmonds did not want Christopher to be a beneficiary, he would know that he needed

20

to have a will to exclude Christopher from inheriting part of his estate.  Therefore, even if he lost confidence in his daughter, there is no indication that he would want his property to pass through intestate succession under any circumstances.

It is important to note in this instance that a neatly bound photocopy of Edmonds' 2002 Will and Trust was found in a drawer in the filing cabinet in Edmonds' office, exactly where Edmonds had stated he kept his important papers.  The photocopy was fully executed.  However, the original of the document could not be found.  The fully executed photocopy was found where Edmonds stated he would keep his important papers.  If he had intended to revoke the 2002 Will by destroying the original, it would have been logical that he would have removed the photocopy from his file of important papers.

Edmonds never indicated to his wife, or anyone else, that he had destroyed the couple's 2002 estate planning documents. He also made a number of statements in the last two years of his life that reflected his intention that, when he died, his estate would be governed by the 2002 Will and Trust.  In the fall of 2011, he gave a copy of the 2002 Will and Trust to his long-term tax advisor for her review.  In the fall of 2012, he told his close friend, Bettius, that he had no interest in developing a relationship with Christopher, that he had made

appropriate decisions to maximize his estate tax benefits, and that after he died all the decisions regarding the management of his business would be in Elizabeth's hands. This is inconsistent with Edmonds having revoked the will, leaving no estate plan in place.

In March 2013, Edmonds told his close friend Bell that, "as soon as I go, everything goes to Liz. As soon as she goes, everything goes to Kelly." In late March or early April, just weeks before his death, Edmonds told Elizabeth that they should meet with their attorney when they returned to Arlington from Florida to begin funding their trust and taking the other steps their attorney had recommended as part of the 2002 estate plan.

As in Jackson and Bowery, it is demonstrated on the present record with clear and convincing evidentiary support that in all of his statements Edmonds confirmed the intention that his wife and daughter were to be the objects of his bounty, and that he specifically did not intend to leave anything to his son. There is also no evidence in the record of anything that might have happened to change Edmonds' mind in the period prior to his death. Accordingly, we hold that these facts are sufficient to support the trial court's finding of clear and convincing evidence that Edmonds did not destroy the original 2002 Will with the intention of revoking it.

### III. Conclusion

For the reasons stated, we will affirm the judgment of the trial court.

<u>Affirmed.</u>
